Carole KNEELAND, Belo Broadcasting Corporation, the Times Herald Printing Company, David Eden and A.H. Belo Corporation d/b/a Belo Corporation News

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION and Southwest Athletic Conference.

Civ. No. A–85–CA–616.

United States District Court, W.D. Texas, Austin Division.

May 16, 1986.

See also 650 F.Supp. 1064, 650 F.Supp. 1076.

Jack Balagia, Jr., James R. Raup, McGinnis, Lochridge & Kilgore, Austin, Tex., for plaintiffs Carole Kneeland and Belo Broadcasting Corp.

William D. Sims, Paul C. Watler, Jenkens & Gilchrist, Dallas, Tex., for plaintiff-intervenor A.H. Belo Corp. d/b/a The Dallas Morning News.

Frank C. Vecella, Charles L. Babcock, Michael Knapek, Jackson, Walker, Winstead, Cantwell & Miller, Dallas, Tex., for plaintiffs-intervenors The Times Herald Printing Co. and David Eden.

Robert M. Roller, Graves, Dougherty, Hearon & Moody, Austin, Tex., for defendant Nat. Collegiate Athletic Ass'n.

John R. Henderson, Jones, Day, Reavis & Pogue, Dallas, Tex., for defendant Southwest Athletic Conference.

## MEMORANDUM OPINION AND ORDER

NOWLIN, District Judge.

This cause came before the Court for a non-jury trial on March 6 and 7, 1986. Pursuant to the Court's order bifurcating the trial of this cause, the issues before the Court are the Plaintiffs claims brought pursuant to 42 U.S.C. section 1983, and whether the Texas Open Records Act, TEX.REV.CIV.STAT.ANN. art. 6252–17a (Vernon Supp.1986) (the "Act"), applies to the National Collegiate Athletic Association (NCAA) and the Southwest Athletic Conference (SWC). The Court has considered the pleadings as well as the evidence adduced at trial and is of the opinion that judgment for the Defendants should be entered on Plaintiffs' claims brought under section 1983, and that both the NCAA and the SWC are subject to the Act.

## I. BACKGROUND

The Plaintiffs in this action all sent to the NCAA and SWC requests to inspect and copy certain information relating to infractions or possible infractions of NCAA regulations by various SWC members. Both Defendants alleged they were not "governmental bodies" as defined by the Act and refused to provide access to the information sought by Plaintiffs. Neither Defendant requested that the Texas Attorney General issue an opinion as to whether or not they were subject to the Act though the Act specifically provides for such opinions. *Id.* at § 7. On October 3, 1985, Plaintiffs Kneeland and Belo Broadcasting filed an original petition and application for writ of mandamus in the 261st Judicial District Court of Travis County, Texas. The petition alleges that the Defendants are "governmental bodies" as defined by the Act, and seeks a declaration that the information sought is "public information" under the Act. The petition further seeks a writ of mandamus which directs the De-

fendants to make available the information sought by the Plaintiffs. Within two weeks of the date that the original petition was filed, A.H. Belo Corporation, d/b/a The Dallas Morning News, and The Times Herald Printing Company and David Eden intervened with similar petitions. On October 26, 1985, the cause was removed to this Court by both Defendants. After a pre-trial conference held on February 6, 1986, the Court granted defendant NCAA's Motion for Separate Trial on the issue of whether the Defendants were "governmental bodies" as defined by the Act, and the Plaintiffs' claims brought under 42 U.S.C. section 1983.

## II. THE NCAA

The NCAA is a private association consisting of approximately 900 members located in all fifty states. Approximately one-half of the members are public universities or colleges. The NCAA is a Kansas association whose officers and employees are located in Mission, Kansas. Members of the NCAA are placed in various divisions based upon a variety of factors. Most of the major football playing universities, over one-half of which are public universities, are members of Division 1-A. All members of the SWC are members of Division 1-A; and eighteen (18) public universities of the State of Texas are members of other divisions of the NCAA. The SWC is also a member of the NCAA.

The NCAA and its member schools are governed by a constitution, bylaws and executive regulations, that are contained in the 1985–86 NCAA Manual. Members must agree to "administer their athletic programs in accordance with the constitution, the bylaws and other legislation of the Association." NCAA Constitution, art. 4, § 2(a). Further, "telecasting, cablecasting or otherwise televising of intercollegiate football games of member institutions may be subject to the provisions of bylaws enacted by the Association." *Id.* art. 3, § 11.

The NCAA holds an annual convention of all members, and meets at other times as

prescribed by the Executive Committee. *Id.* art. 5, § 7(a). Between conventions the establishment and direction of the NCAA's general policy is entrusted to a Council of the members, elected at the annual convention. The Council elects nine members of the fourteen member Executive Committee. *Id.* art. 5, § 2(c). The Committee has the following duties:

(1) Transact the business and administer the affairs of the Association in accordance with the policies of the Association and the Council;

\* \* \* \* \* \*

(2) Require all income from membership dues, from activities of the Association and from other sources, except as may be provided in the constitution, bylaws or executive regulations, to be deposited in the general fund;

\* \* \* \* \* \*

(3) Adopt regulations providing for the expenditure of Association funds, conduct of Association meets and tournaments, and distribution of the income of the association. . . .

*Id.* Neither faculty representatives who serve on committees nor voting delegates to the convention receive compensation, other than travel reimbursement, from the NCAA for their NCAA duties.

The president of the NCAA is John R. Davis, Director of Special Programs and Agriculture at Oregon State University; his term expires in January 1987. The Secretary-Treasurer of the NCAA is Wilford S. Bailey, Professor at Auburn University; his term expires in January 1987. The NCAA Division One Vice President is Arliss Roaden from the Tennessee Technological University; his term expires in January 1987. The NCAA Division Two Vice President was Abe Sponberg from North Dakota State University; his term expired in January 1986. The NCAA Division Three Vice President was Elizabeth Kruczek of Fitchburg State College; her term expired in January 1986. Richard W. Burns, Professor of Teacher Education at the College of Education at the University of Texas at El Paso, was a member of the NCAA Council for a four year period ending in January, 1986. Currently, Albert M. Witte, Professor of Law at the University of Arkansas Law School, is the SWC representative on the NCAA Council.

Until his resignation in January 1986, one year prior to the expiration of his term, Fred Jacoby, SWC Commissioner, served on the NCAA Executive Committee. The 1984–85 Annual Reports of the NCAA contain the Secretary-Treasurer's Report which includes the financial statements of the NCAA for its fiscal years ending August 31, 1984 and August 31, 1985. The report indicates that the NCAA has three principle sources of revenue; dues, television gross rights fees, and championship events and tournaments.

The Bylaws of the NCAA require the payment of annual dues by each member, and the amount of the required annual dues varies depending upon the particular class of membership. The NCAA received dues payments from at least eighteen Texas state universities from the years 1981–82 through 1985–86. During this period, these eighteen Texas state universities paid approximately $77,000 in dues to the NCAA for the years 1981–82 through 1985–86. Each member of the SWC pays NCAA annual dues of $1,800.00 and the SWC pays annual dues of $900.00. These dues are paid by the universities from their auxiliary enterprise accounts. Failure to pay dues results in termination of membership and ineligibility of the delinquent member to compete in meets or tournaments of the NCAA. Income to the NCAA from dues payments are deposited into the same bank account as all other NCAA revenues; the NCAA pays all of its expenses from this same general account. Pursuant to NCAA Bylaw 9–3–(a), the revenue derived from annual dues shall be used "to cover the direct costs of Association publications, convention operations, establishment and maintenance of playing rules, and compilation of playing statistics." NCAA Bylaws art. 9, § 3(a).

The Bylaws of the NCAA provide that the gross rights fee paid for each game of a national telecast or cablecast of member institutions' intercollegiate football games shall be subject to an assessment of four per cent to be paid by the home institution to the NCAA to fund the costs of the NCAA postgraduate scholarship program and football-related services of the NCAA. *Id.* art. 8, § 2(c). In the 1984–85 fiscal year, the NCAA received football television gross rights fees assessments from the University of Texas at Austin and Texas A & M University in the total amount of $63,960.00. Income to the NCAA from football television gross rights fees assessments are deposited into the same bank account as all other NCAA revenues. The NCAA pays all of its expenses from this same general account.

The third principle source of revenue to the NCAA is the receipts from championship meets. Regulation 1 of the Executive Regulations of the NCAA governs NCAA championship meets and tournaments. Member institutions which host NCAA championships are responsible for administering the finances of the tournament in accordance with Regulation 1.

The regulation authorizes the host institution to deduct the greater of 10 to 15 percent of the net receipts or $200 to $750, depending upon the particular tournament, in return for hosting the event. A host institution, however, is not entitled to reimbursement for the cost of permanent equipment, local transportation for competing teams and on-campus facility rental charges. Further, the host institution is not entitled to reimbursement for the time and services rendered by athletic department staff members, including the host institution's athletic director, who administers the tournament. Moreover, costs of the championship event that exceed the NCAA's pre-approved budget are not reimbursed to the host institution.

Texas state universities hosted eleven NCAA championship events on their campuses from the years 1981 through 1984. In 1985, The University of Texas sent the NCAA approximately $88,000.00 as net receipts from the University's hosting of the NCAA regional baseball tournament. In 1981 and 1982, the University of Texas sent the NCAA $36,524.83 and $40,707.32, respectively, as payment of net receipts from hosting NCAA championships. In 1984, the University of Houston paid the NCAA $151,876.31 as payment of net receipts from hosting NCAA championships.

The NCAA deposits the revenues it receives from Texas public universities, together with the revenues it receives from its other members, into a single general bank account from which the NCAA pays all of its expenses. Revenues received by the NCAA from member institutions which host NCAA championship events are used to fund all departments of the NCAA, including the enforcement department.

III. THE SWC

The Defendant SWC is an unincorporated non-profit association of nine member universities, four of which are Texas public universities. The Texas public university members are the University of Texas at Austin, Texas Tech university, the University of Houston and Texas A & M University. The other members of the SWC are Baylor University, Southern Methodist University and Texas Christian University, which are private, church-sponsored institutions; William Marsh Rice University, a private institution; and, the University of Arkansas, a public University of the State of Arkansas. The Conference employs a paid staff and incurs general operating expenses for such items as administrative offices, public relations, travel annuities, investigations, donations and miscellaneous matters.

The current president of the Southwest Athletic Conference is Dr. Michael T. Johnson, the faculty representative from the University of Houston. Dr. Johnson on one occasion has had his teaching load reduced by the University of Houston in part to compensate him for his duties as faculty representative to the Southwest Athletic Conference. The University of Houston

maintains an executive liability and indemnification policy of insurance covering Dr. Johnson's acts as Southwest Athletic Conference President and faculty representative.

The SWC is governed by a constitution and bylaws, and operates under an annual budget. The 1986 Budget of operating and payroll expenses amounts to approximately $919,100.00. The receipt of revenue by the SWC is governed by Article IX of the Conference Bylaws. The SWC receives revenue from only five (5) sources: (1) post-season football bowl games; (2) football television broadcasts; (3) post-season basketball tournaments; (4) basketball television broadcasts; and, (5) interest-bearing bank accounts. SWC members do not pay dues, assessments or fees, though SWC Bylaws provide that if its revenues from member institutions are insufficient to pay its expenses, the conference can make assessments against its member institutions. SWC Bylaws art. 9. The SWC does not receive any federal or state tax-generated revenues or legislative appropriations. Its two principle sources of revenue are derived from television and post-season bowl game revenues. The vast majority of the revenue derived from telecast football games is paid directly to the SWC by its member schools pursuant to a formula set out in the bylaws. SWC Bylaws art. 9.04. (The Conference receives a much smaller portion of its telecast revenues from a broadcasting agreement with RAYCOM, Inc., which telecasts approximately eight SWC games during the season.)

Article 9.04 of the Conference Bylaws provides that any "SWC team competing in a non-conference regionally or nationally televised football game shall retain fifty (50) percent of that team's share of the receipts and fifty (50) percent of that team's share of the receipts shall be paid to the Conference office." SWC Bylaws art. 9.04. Teams competing in regionally or nationally televised conference games "retain thirty (30) percent (15 percent for each team) of the receipts and seventy (70) percent of the receipts shall be paid to the Conference office." *Id.* All television receipts from the syndicated conference football television package (RAYCOM) are paid to the Conference office. This procedure was followed through November 16, 1985. On that date, two weeks after his deposition was taken in this cause, SWC Commissioner Fred Jacoby wrote a letter to the College Football Association requesting that payments for the telecasts of football games played by SWC members during the 1985 football season be sent directly to the SWC. Since that date, the SWC deducts and retains that percentage of the receipts that the bylaws direct be sent to it, deducts a 4% assessment of the proceeds which is sent to the NCAA, and sends the remaining balance to the SWC school(s) which participated in the televised football game.

The proceeds from national and/or regional telecasts or cablecasts of SWC member schools (other than the RAYCOM telecast) were sent directly to the schools from 1981 through the 1984–85 academic year. Other than RAYCOM contracts, neither the SWC nor the NCAA are parties to any football television contracts under which the SWC schools receive proceeds. The University of Texas at Austin received proceeds of television rights fees by check made payable to the University. Upon receipt the check would be deposited into a University checking account along with other revenues received during a given time period. The athletic department of the University would then submit a local funds voucher to the Bursar's Office where a check would be made payable to either the NCAA, the SWC, or both, in payment of the University's obligation under the respective bylaws of the NCAA and SWC. The University of Houston followed a similar procedure. The funds received by the Southwest Athletic Conference from the member universities come from the auxiliary enterprises of the member universities. Funds received by the SWC from its member schools are deposited into its interest-bearing checking account at the Bank of Dallas from which bank account the SWC pays all of its expenses. The SWC takes money out of its interest-bearing checking

account and invests it in certificates of deposit from time to time.

Under Article IX of the SWC Bylaws, each Spring the Commissioner prepares a budget each Spring of the Conference's operating expenses for the following academic year. Once the budget is approved by the SWC's executive committee, the SWC deducts from its current funds an amount equal to the approved budget, and then distributes the remaining funds equally to its member universities. The funds deducted are used to pay the SWC's operating expenses.

## IV. SECTION 1983 CLAIMS

Plaintiffs Kneeland and Belo Broadcasting, as well as Belo Corporation d/b/a The Dallas Mornings News,[1] claim that the Defendants' refusal to provide the records and information requested violated their constitutional right of access to public information, and therefore gives rise to a cause of action under 42 U.S.C. section 1983. The Defendants argue that the Plaintiffs have no constitutional right to the records they seek, and that they did not act under color of state law when they refused to disclose the information.

■ The Defendants are only subject to a suit under section 1983 if they acted "under color of state law" when they denied Plaintiffs' requests for information. 42 U.S.C. § 1983; *Rendell-Baker v. Kohn*, 457 U.S. 830, 835–36, 102 S.Ct. 2764, 2768–69, 73 L.Ed.2d 418 (1982); *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974). The Defendants have acted under color of state law if "there is a sufficiently close nexus between the State and the challenged action of the [Defendants] so that the action of the latter may be fairly treated as the action of the State itself." *Jackson*, 419 U.S. at 351, 95 S.Ct. at 453. Consequently,

the Court must determine whether the alleged infringement of Plaintiffs' constitutional rights is "fairly attributable to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982). No precise formula determines whether otherwise private conduct constitutes state action.[2] *Arlosoroff v. National Collegiate Athletic Association*, 746 F.2d 1019, 1021 (4th Cir.1984). The Court must determine the facts and circumstances of each case in making this determination. *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961).

The Fifth Circuit has determined that activities of the NCAA constitute action under color of state law. *Hennessey v. National Collegiate Athletic Association*, 564 F.2d 1136, 1144 (5th Cir.1977) (adopting memorandum opinion of district court); *Parish v. National Collegiate Athletic Association*, 506 F.2d 1028, 1032–33 (5th Cir. 1975); *accord Howard University v. National Collegiate Athletic Association*, 510 F.2d 213 (D.C.Cir.1975). This Court is of the view, however, that the Supreme Court decisions in *Rendell-Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), and *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 75 L.Ed.2d 534 (1982), require a different result.

Under *Rendell-Baker* and *Blum*, state subsidization with public funds and extensive state regulation do not necessarily convert private action into state actions. *Rendell-Baker*, 457 U.S. at 840–41, 102 S.Ct. at 2770–71; *Blum*, 457 U.S. at 1007–10, 102 S.Ct. at 2787–89. Further, the Court noted that a private party's performance of a function which serves the public does not necessarily make its acts state action. "[T]he question is whether the function performed has been 'traditionally the *exclusive* prerogative of the State.'" *Ren-*

---

**1.** Plaintiffs Dallas Times Herald and David Eden voluntarily dismissed their § 1983 claims by amendment on February 12, 1986.

**2.** The "under color of state law" requirement of 42 U.S.C. § 1983 reflects the state action requirement of the 14th Amendment; consequent-

ly, the semantic distinction between these phases is of no import. *Rendell-Baker*, 457 U.S. at 838, 102 S.Ct. at 2769 (*citing United States v. Price*, 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 1157 n. 7, 16 L.Ed.2d 267 (1966)).

*dell-Baker,* 457 U.S. at 842, 102 S.Ct. at 2772 (citations omitted) (emphasis original).

 The Plaintiffs have made no showing that the State of Texas or the state universities which are members of the Defendant associations, acted in any manner which caused the Defendants to deny the Plaintiffs' request for information. Further, this Court's ruling that Defendants are governmental bodies under the Act does not compel a finding that Defendants' action amounted to state action. The Act defines a governmental body as an association "which is supported in whole or in part by public funds, or which expends public funds." TEX.REV.CIV. STAT.ANN. art. 6252–17a, § 2(1)(F) (Vernon Supp.1986). Under *Rendell-Baker* state subsidization with public funds is not sufficient to convert private action into state action, *Rendell-Baker,* 457 U.S. at 840, 102 S.Ct. at 2770; consequently, the Court's determination that Defendants are governmental bodies does not require a finding that their actions are state actions.

 Finally, the Plaintiffs have failed to establish that the Defendants perform a public function which is "traditionally exclusively reserved to the state." The Defendants doubtless perform some sort of public function in regulating the nation's intercollegiate athletics; however, the state is not necessarily required to undertake such functions. *See Blum,* 457 U.S. at 1004, 102 S.Ct. at 2785. This conclusion becomes evident in light of the Court's ruling in *Rendell-Baker.* If the public function performed in that case does not amount to one traditionally exclusively reserved to the state, then neither does regulation of intercollegiate athletics. Regulation of intercollegiate athletics is not a function "traditionally *exclusively* reserved to the state." *Jackson,* 419 U.S. at 352, 95 S.Ct. at 454 (emphasis added); *accord Arlosoroff,* 746 F.2d at 1019; *McHale v. National Collegiate Athletic Association,* 620 F.Supp. 67 (N.D.N.Y.1985) (memorandum opinion). Plaintiffs have failed to establish that the Defendants acted under color of state law when they denied Plaintiffs' request for information. Pursuant to *United Mineworkers v. Gibbs,* 383 U.S. 715, 725–29, 86 S.Ct. 1130, 1138–41, 16 L.Ed.2d 218 (1965), the Court in its discretion, hereby exercises its pendent jurisdiction and retains the Plaintiffs' state law claims.

## V. THE TEXAS OPEN RECORDS ACT

The Act was passed by the 63rd Legislature in 1973. It was part of a wave of governmental reform precipitated by the infamous "Sharpstown Scandal." The Act begins with a general declaration of policy:

> Pursuant to the fundamental philosophy of the American constitutional form of representative government which holds to the principle that government is the servant of the people, and not the master of them, it is hereby declared to be the public policy of the State of Texas that all persons are, unless otherwise expressly provided by law at all times entitled to full and complete information regarding the affairs of government and the official acts of those who represent them as public officials and employees. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may retain control over the instruments they have created. To that end, the provisions of this Act shall be liberally construed with the view of carrying out the above declaration of public policy.

TEX.REV.CIV.STAT.ANN. art. 6252–17a, § 1 (Vernon Supp.1986).

The Act provides for public access to information retained by a "governmental body" as defined in section 2(1) of the Act. Section 2(1) defines a "governmental body" as:

> (A) any board, commission, department, committee, institution, agency, or office within the executive or legislative branch of the state government, or which is created by either the executive or legislative branch of the state government

and which is under the direction of one or more elected or appointed members;

(B) the commissioners court of each county and the city council or governing body of each city in the state;

(C) every deliberative body having rulemaking or quasijudicial power and classified as a department agency or political subdivision of a county or city;

(D) the board of trustees of every school district and every county board of school trustees and county board of education;

(E) the governing board of every special district;

(F) the part, section, or portion of every organization, corporation, commission, committee, institution, or agency which is supported in whole or in part by public funds, or which expends public funds. Public funds as used herein shall mean funds of the State of Texas or any governmental subdivision thereof.

(G) the Judiciary is not included within this definition.

*Id.* at § 2(1). Subdivision F provides the basis for the Plaintiffs' argument that the Defendants are governmental bodies within the meaning of the Act. Thus, the key issue in determining whether the Defendants are governmental bodies is whether they are supported in whole or in part by public funds, or whether they expend public funds. Subdivision F specifically defines public funds as "funds of the State of Texas or any governmental subdivision thereof." *Id.* This broad provision does not limit the definition of public funds to a particular source, i.e., tax revenues. In fact, under Texas law "public funds" include the State's money, property and contractual rights. *See Rhoads Drilling Co. v. Allred,* 123 Tex. 229, 70 S.W.2d 576, 581–82 (1934); *Goggans v. Simmons,* 319 S.W.2d 442, 445 (Tex.Civ.App.—Fort Worth 1958, writ ref'd n.r.e.); TEX.ATT'Y

GEN.OP. NO. MW–25;[3] *see also Womack v. Womack,* 141 Tex. 299, 172 S.W.2d 307, 308 (1943); The time and services provided by state employees constitute public funds. TEX.ATT'Y GEN.OP. NOS. JM–431 (1986), MW–373 (1981), MW–89 (1979), H–1309 (1978). The use of buildings or facilities that belong to the state constitutes receipt of public funds. TEX.ATT'Y GEN.OP. NO. MW–373. Even reimbursement of expenses for service on a committee constitutes receipt of public funds. TEX.ATT'Y GEN. ORD–273 (1981). The state-supported universities are agencies of the state whose funds belong to the State of Texas, i.e., are public funds. TEX.EDUC. CODE ANN. § 51.002 (Vernon 1972); *Walsh v. University of Texas,* 169 S.W.2d 993, 993–94 (Tex.Civ.App.—El Paso 1942, writ ref'd); *see also Lowe v. Texas Tech University,* 540 S.W.2d 297–98 (Tex.1976) (*citing Walsh,* 169 S.W.2d 993); *Bache Halsey Stuart Shields, Inc. v. University of Houston,* 638 S.W.2d 920, 923–25 (Tex. App.—Houston [14th Dist.] 1982, writ ref'd n.r.e.); *Lyons v. Texas A & M University,* 545 S.W.2d 56, 58 (Tex.Civ.App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.). *See Bd. of Regents of the University of Oklahoma v. NCAA,* 546 F.Supp. 1276, 1303 (W.D. Okla.1982), *aff'd,* 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). Funds generated by the athletic departments of State universities, characterized as auxiliary enterprise funds, are also public funds of the State of Texas. TEX.ATT'Y GEN.OP. NOS. O–1662 (1940), V–715 (1948), H–456 (1974).

Because an organization receives public funds does not necessarily mean that it is "supported in whole or in part by public funds," and is therefore subject to the terms of the Act. Private persons or businesses are not subject to the Act merely because they provide specific goods or services pursuant to a contract with a govern-

---

**3.** Section 7 of the Act charges the Attorney General with the obligation of interpreting the Act. TEX.REV.CIV.STAT.ANN. art. 6252–17a, § 7 (Vernon Supp.1986). Consequently, Texas courts have consistently accorded great, though not conclusive, weight to the General's opinions.

*City of Houston v. Houston Chronicle Publishing Co.,* 673 S.W.2d 316 (Tex.Civ.App.—Houston [14th Dist.] 1984, no writ); *Smith v. McCoy,* 533 S.W.2d 457 (Tex.Civ.App.—Dallas 1976, writ dism'd).

mental body, TEX.ATT'Y GEN. ORD–302 (1982), ORD–228 (1979), ORD–1 (1973). If a contract imposes a specific and definite obligation on the private contractor to provide "a measurable amount of service in exchange for a certain amount of money as would be expected in a typical arms length contract for services between a vendor and purchaser ...," the private contractor will not be subject to the Act. ORD–302 (1982). Further, the contract must contain no provision which either indicates a common purpose or objective between the purported governmental body and the public entity with which it contracts, or could be construed as constituting an agency-type relationship. TEX.ATT'Y GEN. ORD–228 (1979). Finally, it is apparent from transcripts of the House debates that private persons and entities were intended to come within the coverage of the Act as shown by the following passage:

REP. CLAYTON: Mr. Denton, I am concerned about Section 2 on page 10, where we are setting out there that part, section or portion of every organization, corporation, commission, committee, institution or agency which is supported in all or in part by public funds. What bothers me in this particular language, I'm thinking about [a] corporation. Say, for instance, if we were concerned with maybe STECK who does a lot of contract work for the State in printing matters. Would this bill subject them to throwing their records open to the public simply because a part of their support is due to state contracts?

REP. DENTON: This is the part I understand, and I certainly think there would be due concern; but it would be only those records pertaining to that state contract. Expenditure of state funds, public funds as used in this, shall mean the funds of the State of Texas. So I would only use the expenditure of that particular part.

REP. CLAYTON: Where do we see that at?

REP. DENTON: Line 13. This was added in subcommittee. The Amendment, Mr. Clayton, in H.B. 6 went to State Affairs Committee, did not include the Senate. Public funds as used herein means the funds of the State of Texas. That was added by subcommittee.

Transcript of House Debates at 23–24; *accord* TEX.LEG.COUNCIL, Reform Legislation: *Text, Analysis and Forms* at 99 ("nearly every unit of government ... as well as organizations which are not necessarily governmental, but are supported in whole or in part with public funds ..." included in definition of "governmental body").

The contractor will be subject to the terms of the Act if *any* portion of the public funds paid to the contractor are paid for the general support of the contractor under *any* provision of the contract, and are not attributable to specific payment for specific measurable services. ORD–302 (1982), ORD–228 (1979).

## VI. APPLICATION OF THE ACT TO THE NCAA

### A. *Extra-territorial Application*

The NCAA argues the Act has no extra-territorial application. In *Marmon v. Mustang Aviation, Inc.,* 430 S.W.2d 182 (Tex. 1968), the Supreme Court held that the Texas Wrongful Death Statute had no extra-territorial jurisdiction. The Court based its decision on three factors: the statute expressed no such intent; Texas Courts had "repeatedly held that the statute had no extraterritorial effect;" and, despite such rulings from the Courts the legislature had re-enacted the statute a number of times with no amendment. *Id.* at 187. Thus, the Court concluded that the legislature did not intend that the statute be given extra-territorial effect. In determining the territorial limits of the statute, the Court cited the following rule:

"Implied Territorial Limitations.—Unless the intention to have a statute operate beyond the limits of the state or country is *clearly expressed or indicated by its language, purpose, subject matter, or history,* no legislation is presumed to be intended to operate outside

the territorial jurisdiction of the state or country enacting it. To the contrary, the presumption is that the statute is intended to have no extraterritorial effect, but to apply only within the territorial jurisdiction of the state or country enacting it, and it is generally so construed. An extraterritorial effect is not to be given statutes by implication. * * * " (50 Am. Jur. 510. Statutes § 487).

*Marmon,* 430 S.W.2d at 187. (Emphasis added).

■ The cardinal rule of statutory construction is to determine the intent of the legislature and give effect to that intent. *Knight v. International Harvester Credit Corp.,* 627 S.W.2d 382, 384 (Tex.1982). Legislative intent is determined by an analysis of the statute as a whole, rather than through scrutiny of isolated portions. *Taylor v. Firemen's & Policemen's Civil Service Commission,* 616 S.W.2d 187, 190 (Tex.1981). If a statute is clear and unambiguous, extrinsic aids and rules of construction are inapplicable, and words shall be given their common, everyday meaning. *Cail v. Service Motors, Inc.,* 660 S.W.2d 814, 815 (Tex.1983); *Minton v. Frank,* 545 S.W.2d 442, 445 (Tex.1976). Finally, the Court should give the statute a reasonable construction to avoid injustice or an absurd result. *Gulf Ins. Co. v. James,* 143 Tex. 424, 185 S.W.2d 966, 969 (1945).

■ No provision of the Act expressly gives it extraterritorial application, nor have Texas courts ruled on the extraterritorial effect of the statute. The language, subject matter and purpose of the Act, however, do evince a clear intent that the Act be given extraterritorial application. The Act is designed to guarantee to the citizens of the State of Texas "full and complete information regarding the affairs of government and the official acts of those who represent them as public officials and employees." TEX.REV.CIV. STAT.ANN. art. 6252–17a, § 1 (Vernon Supp.1986). The provisions of the Act are to be liberally construed so that the policy of the act may be carried out. *Id.* Section 2(1)(F) defines a governmental body as the part, section or portion of *every* organization ... or agency which is supported in whole or in part by public funds, or which expends public funds. *Id.* (emphasis added). The word "every" means "each individual or part of a group without exception...." WEBSTER'S NEW COLLEGIATE DICTIONARY 393 (1979). By using the word "every" the legislature evinced an intent to apply the Act to both in-state and out-of-state corporations or associations. The sole requirement under the Act is that the entity in question receive some support in the form of Texas public funds. If the particular entity falls within the definition of governmental body contained in the Act, its geographic location is irrelevant.

It would be illogical for the Court to find that the purpose of the Act is to ensure public access to information concerning the affairs of government, but then hold that the Act does not apply to foreign entities who fall within the definition of governmental body contained in the Act. Further, to end application of the Act at the State's borders would severely cripple the purpose of the Act. Those defined as governmental bodies under the Act could avoid its application by merely incorporating outside of the State's boundaries. The public would then be denied information concerning the expenditure or use of its funds despite the clear purpose of the Act.

### B. *Choice of Law*

The NCAA next argues that Texas law does not apply to this case because choice of law principles preclude application of the Act to the NCAA.

■ When the Court exercises its pendent jurisdiction over Texas state law claims, it must apply Texas choice of law rules. *United Mineworkers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). Texas courts employ the "most significant relationship" test in all choice of law cases. *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 421 (Tex. 1984); *see Gutierrez v. Collins,* 583 S.W.2d 312, 318–19 (Tex.1979). The law of the state with the most significant relationship

to the issue in this case will be applied to resolve the issue. *Duncan*, 665 S.W.2d at 421. The State of Texas has the most significant contacts in this case: the Plaintiffs are residents of Texas; eight of the nine members of the SWC are located in Texas; and the NCAA conducted a number of investigations which uncovered the information sought by Plaintiffs in Texas. Consequently, this Court is of the view that the law of Texas applies to this case.

### C. *Receipt of Public Funds*

Plaintiffs argue that the NCAA receives public funds for its general support from Texas state-supported universities in three specific forms: dues payments; assessments against the universities' football television gross rights fees; and, costs, expenses and salaries absorbed by the universities when they host NCAA tournaments and championship meets, and when they allow state employees to work for the NCAA without reimbursement. First, the Court must determine whether the funds described above are "public funds;" if not, the inquiry ends. If they are public funds the Court must determine whether the NCAA's Bylaws and constitution impose a "specific and definite obligation" on the NCAA "to provide a measurable amount of service in exchange for a certain amount of money," i.e., the funds described above. If the NCAA does not receive public funds for its general support it is not subject to the Act. TEX.ATT'Y GEN. ORD–228 (1979).

 NCAA dues are paid from the auxiliary enterprise accounts of the state universities. The funds contained in these accounts belong to the State of Texas, i.e. are public funds. TEX.ATT'Y GEN.OP. NOS. 0–1662 (1940), V–715 (1948). NCAA Bylaw 9, section 3(a) states that annual dues are intended to cover the costs of "association publications, convention operations, establishment and maintenance of playing rules, and compilation of statistics." *Id.* These vague and amorphous provisions in no way impose a specific duty on the NCAA to return a measurable ser-

vice in return for these funds. Rather, they are used to cover the general operating expenses. Attorney General Opinion JM–116 reached a similar conclusion. The Attorney General found that a state universities payment of annual membership dues to an intercollegiate athletic association were sufficient to subject the association to the Act. TEX.ATT'Y GEN.OP. JM–116 (1983). Similarly, this Court finds that the NCAA's receipt of annual dues payments from state-supported universities provides a basis for determining that the NCAA is a "governmental body" as defined by the Act.

NCAA Bylaw 8, section 2(c) provides for a 4% television gross rights fee assessment. The rights to televising games are owned by the member-universities who participate in that game. *See Board of Regents of University of Oklahoma v. National Collegiate Athletic Association*, 546 F.Supp. 1276, 1326 (W.D.Okla.1982), *aff'd*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). Football television rights and fees owned by state-supported universities are property of the state and become public funds. *Rhoads*, 70 S.W.2d at 576; *Goggans*, 319 S.W.2d at 445; *see Womack*, 172 S.W.2d at 308.

 The NCAA argues pursuant to Bylaw 8–2–(c) that it is contractually entitled to its share of the telecast revenues before any member university has arranged to have its games televised. They argue that the university holds 4% of the gross rights fee in trust for the benefit of the NCAA; consequently, the 4% assessment does not constitute public funds. Revenues from television broadcasts are derived from contracts negotiated by the television networks and the universities, owner of the television rights. The NCAA has no contractual relationship with the television networks; the revenues the networks are obligated to pay are not owed to the NCAA. Merely because payment of a debt is to be calculated on the basis of a percentage of income derived by the obligor from a third party does not render the obligor a trustee, and does not change a purely contractual

debt relationship into a trust. *McCord v. Fort Worth National Bank*, 275 S.W.2d 717, 719 (Tex.Civ.App.—Ft. Worth 1955, writ ref'd n.r.e.). Even if the NCAA were correct in its allegation of trust relationship, television revenues are still public funds. It is undisputed that in the first instance the television rights belong to the member universities. No matter how the NCAA has obtained its ownership interest in the funds, it has received public funds. The question then becomes whether the public funds were exchanged for a specific measurable amount of services.

Bylaw 8–2–(c) states that the assessments fund the costs of "the NCAA postgraduate scholarship program and football-related services of the NCAA." The bylaw does not specify the amount, number or beneficiary of the scholarships or scholarship. Further, the bylaw does not indicate what constitutes a "football-related service." The 1981 Football Television Briefing Book, a publication of the NCAA, does indicate, however, that the assessment "funds the NCAA postgraduate scholarship program, football promotion, television administration, sports development and general administration...." There is no evidence that the NCAA has changed this application of funds. It is clear that the assessments, like the dues revenues, are used for the general support of the NCAA and are not exchanged for specific measurable services. The NCAA's receipt of the assessment provides another basis for determining that the NCAA is a "governmental body" as defined by the Act.

NCAA Executive Regulation One governs championship events and tournaments. The regulation authorizes reimbursement for some expenses but specifically prohibits reimbursement of the following:

1. On-campus facility rental charges;
2. The cost of permanent equipment;
3. Local transportation of competing teams;
4. Salaries of athletic department staff members who administer the tournament;

5. Salary of the institution's athletic director, who is on the game committee that supervises the athletic department staff in administering the event; and
6. Any costs that exceed the approved budget.

NCAA Regulation 1, §§ 2(e), 8(d)(1), 12. Because the costs outlined above are not reimbursed by the NCAA, they are necessarily paid with public funds by the state-supported university which has hosted the event. Accordingly, the public funds are necessarily expended in connection with the NCAA's tournaments and championship events. The NCAA gives nothing in exchange for these particular public funds. The Court is of the opinion that these funds are used for the general support of the NCAA, therefore the NCAA falls under the definition of governmental body and is subject to the Act.

 Relying on the definition of "governmental body," the NCAA alleges that the Enforcement Division is that "part" of the Association which maintains the information sought by Plaintiffs. They argue that because this "part" of the Association is not supported in whole or part by public funds, it is not subject to the terms of the Act and cannot be compelled to release the information. Their argument must fail for two reasons. The NCAA's interpretation of the definition would allow each and every entity, otherwise defined as a governmental body under the Act, to avoid application of the Act by establishing an independent source of funding for that portion of the entity which maintained its records. In light of the liberal construction which the Act must be given and the fact that this interpretation would effectively thwart the purpose of the Act, the Court must reject the NCAA's contention. Second, even if the NCAA were correct in its argument, it admits that the Enforcement Division is funded by championship events and tournaments. The Court has already determined that a portion of these revenues are

public funds of the State of Texas.[4] Consequently, the NCAA's argument must fail. Further, the Court would note that the NCAA comingles all sources of its revenue in a simple bank account. According to the testimony of the NCAA's Controller it would be difficult, if not impossible, for the NCAA to determine which revenue paid which expenditure. In fact, the Controller testified that the NCAA spent more on the items which the bylaws indicate will be supported with dues revenue, than was collected in dues revenue. Consequently, the Court is of the opinion that all departments of the NCAA are supported in part by public funds of the State of Texas. The Court is of the opinion that the NCAA is a governmental body as defined by the Act for the reasons stated above.

 Further, the Court is of the opinion that the information requested of the NCAA is public information. The Act defines public information as: "All information collected, assembled or maintained by governmental bodies pursuant to law or ordinance or in connection with the transaction of official business ..." TEX.REV. CIV.STAT.ANN. art. 6252–17a § 3(a) (Vernon Supp.1986). Clearly the records sought by the Plaintiffs were collected, assembled or maintained by the NCAA in connection with the transaction of the NCAA's official business. There is no support for the NCAA's contention that "official business" is limited to the authorized business of the State of Texas. This Court is of the opinion that the term "official business" includes the official business of any entity which falls under the definition of governmental body. *Industrial Foundation v. Texas Industrial Accident Board*, 540 S.W.2d 668, 676 (Tex.1976); TEX.ATT'Y GEN.OP. NO. JM–116 (1983).

**4.** The Court would note that the definition of governmental body contained in the Act refers to entities "supported in whole or in part by public funds...." The NCAA argues that the funds received from Texas state-supported universities are a minute percentage of their overall budget and do not contribute significantly to their overall budget. Given its plain, everyday meaning the word "part" denotes one of several

## VII. APPLICATION OF THE ACT TO THE SWC

The SWC is a resident of Texas; therefore, there is no question of extraterritorial application or choice of law. The question, therefore, is whether the SWC received public funds. The testimony of the Commissioner of the SWC indicates that the Conference derives all of its income from the athletic events of its member schools, four of which are state-supported universities. The principle revenues of the SWC are derived from receipt of television gross rights fees assessments as provided in Article 9.04 of the Conference Bylaws. From 1981 through 1985, the SWC received in excess of four million dollars through application of this formula.

Once again, the first issue is whether the funds described are "public funds;" if not, the Court's inquiry ends. If they are public funds the Court must determine whether the SWC is under a "specific and definite obligation" to provide a measurable amount of service in exchange for a certain amount of money, i.e., the funds described above. If the funds are received for the general support of the SWC, the Conference is subject to the Act. TEX.ATT'Y GEN. ORD–228 (1979).

 As noted earlier, football television rights are owned by the universities that participate in the game. 546 F.Supp. at 1326. The gross rights fees of state-supported universities are property of the State and become public funds. *Rhoads,* 70 S.W.2d at 576; *Goggans,* 319 S.W.2d at 445.

Clearly, the SWC received public funds. The Court must now determine whether the SWC receives the funds from its member state-supported universities for its gen-

subdivisions which together constitute a whole. *See* WEBSTER'S NEW COLLEGIATE DICTIONARY 828 (1979). Relying upon this definition the Court is of the opinion that any percentage, no matter how great or small, constitutes "support ... in part" under the Act. Consequently, the amount of support contributed to the NCAA, or the SWC for that matter, is irrelevant to the Court's inquiry.

eral support or whether they are received in exchange for a specific measurable service. MW–308.

The SWC argues that it holds the funds as an agent-trustee for the benefit of the school and vice versa. The basis of their argument is that "an agency or trust relationship exists when one party collects or disburses money on behalf of another party." As was the case with the NCAA's trust argument, this argument must also fail. The Court is of the opinion that the obligation imposed upon the SWC member institutions by the SWC Bylaws amounts to a contractual obligation to convey a certain percentage of revenue received to the SWC.

 The funds are not received by a member institution as an agent of the SWC and the member-universities do not stand in a position of trustee. Rather, the member institutions have a separate contractual obligation to the SWC dependent upon another contract. The fact that a percentage of revenue from one contract must in turn be paid to a third party does not create a trust under Texas law. *McCord*, 275 S.W.2d at 719; *see also Frank v. Gaffney*, 2 S.W.2d 885, 886 (Tex.Civ.App.—Galveston 1928).

Next, the SWC argues that its receipt of these funds is merely a typical contract for services. In order to test this argument the Court must determine whether the agreement by which the funds are transferred imposes a specific and definite obligation on the SWC to provide a measurable amount of service in exchange for a certain amount of money, as would be expected in a typical arms-length transaction. TEX. ATT'Y GEN.ORDS. 228, 302. Further, the agreement pursuant to which the funds are paid must contain no provision which either indicates a common purpose or objective between the SWC and the state-supported universities, or could be construed as constituting an agency relationship. *Id.* ORD. 228.

 The Constitution and Bylaws of the SWC pursuant to which the funds in question are transferred, contain no provision which imposes a specific or definite obligation on the Conference to provide a measurable amount of service in exchange for the funds. The Constitution and Bylaws speak only in general terms relating to the general support of the Conference. *E.g.*, SWC Bylaws art. XIX. Further, the Conference itself consists of university members. An agreement cannot be characterized as "at arms length" when a faculty representative agrees that his University should pay funds to an organization of which he is a governing member.

Moreover, it is clear that the SWC shares a similar common interest and objective with its state-supported university members. In fact, the Conference acts as an agent for the universities in some instances. In JM–116, the Attorney General applied the "common interest" test and determined that the Gulf Star Athletic Conference shared similar goals and objectives with its member universities and therefore did not pass the test developed in ORD–228. A comparison of the Gulf Star and SWC purpose clauses indicates that their goals and objectives are virtually identical. *Compare* TEX.ATT'Y GEN.OP. NO. JM–116 *with* SWC CONST. Art. II.

Besides having a common purpose it is apparent that the funds paid to the SWC by the member universities are used to support the general operation of the Conference. The SWC Commissioner testified that the Conference percentage of television revenues was used to support general operation of the Conference. It is clear, therefore, that the Conference receives state funds for its general support which are not paid as a result of a typical arms-length transaction.

The record further shows additional general support by state government for the Conference. The SWC is governed by a nine member board of faculty representatives. Each school provides one representative. The Conference Constitution required that the representative must either be on the faculty or have faculty status at a member institution. SWC CONST. art.

VII. An Executive Committee oversees the day-to-day operations of the Conference and approves its budget. *Id.* art. X. The Committee presently consists of President Michael Johnson, faculty representative from the University of Houston, a state-supported school, Vice-President Bob Sweazy, faculty representative from Texas Tech, a state-supported school, Past President Edwin Horner, Baylor University, a private school, Frank Broyles, athletic director at the University of Arkansas, an out-of-state public school, and athletic director DeLoss Dodds of the University of Texas, a state-supported school. Neither the faculty representatives nor the Executive Committee members receive compensation from the SWC despite the fact that the SWC Commissioner characterized Mr. Johnson's conference duties as "substantial." Thus, four members of the governing board of the SWC must be Texas public employees. Three of the current members of the Executive committee including the president and vice president are Texas public employees. Dr. Johnson, the President, has received added compensation from the University of Houston by the reduction of his teaching load to compensate him, in part, for his service as faculty representative to the SWC. In addition, the University of Houston has maintained an executive liability and indemnification policy covering Dr. Johnson's activities with the SWC. It is undisputed that these state employees support the work of the Conference. Use of state employees in this manner constitutes receipt of public funds under Texas law. TEX.ATT'Y GEN.OP. NOS. JM–431 (1986), MW–89 (1979), H–1309 (1978). Clearly, receipt of this form of public funds goes to the general support of the Conference.

▇ The Court is of the opinion that the funds received by the SWC from state supported universities are public funds, and that the Act applies to the SWC by its express terms. Further, it is clear that the "state funds" received by the SWC are used for its general support.

▇ Finally, the Court finds that the information sought by Plaintiffs was collected, assembled and maintained by the SWC in connection with the transaction of its official business. Consequently, the Court is of the view that the information is "public information." *See* TEX.REV.CIV. STAT.ANN. art. 6252–17a § 3(a) (Vernon Supp.1986); *Industrial Foundation,* 540 S.W.2d at 676; TEX.ATT'Y GEN.OP. NO. JM–116.

VIII. SUMMARY

▇ The Court is of the opinion that both Defendants are governmental bodies within the meaning of the Act, and that the information sought by Plaintiffs is public information within the meaning of the Act. Accordingly, the Court hereby Orders that the Defendants produce the information sought by the Plaintiffs to the Court, within twenty (20) days of the date of this Order, for an *in camera* inspection which will be conducted for the purpose of determining whether any of the exceptions listed in section 3 of the Act prevent disclosure of the information sought. TEX.REV.CIV. STAT.ANN. art. 6252–17a, §§ 3, 7 & 8 (Vernon Supp.1986).

Along with the information submitted for *in camera* review, the Court hereby Orders that the Defendants note within which exception each piece of information falls. Further, the Court will require that the Defendants file a brief setting out those cases, opinions or decisions which support their claims within twenty (20) days of the date of this Order. Plaintiffs will have ten (10) days from their receipt of Defendants' briefs to respond.

Further, the Court finds that the Plaintiffs have failed to establish that the Defendants acted under color of state law when they refused Plaintiffs' requests for information. Accordingly, the Court hereby enters Judgment in favor of the Defendants on Plaintiffs' claims brought under 42 U.S.C. section 1983.