Carole KNEELAND, Belo Broadcasting Corporation, the Times Herald Printing Company, David Eden and A.H. Belo Corporation d/b/a Belo Corporation News

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION and Southwest Athletic Conference.

Civ. No. A–85–CA–616.

United States District Court, W.D. Texas, Austin Division.

Aug. 18, 1986.

See also 650 F.Supp. 1047, 650 F.Supp. 1076.

Jack Balagia, Jr., James R. Raup, McGinnis, Lochridge & Kilgore, Austin, Tex., for plaintiffs Carole Kneeland and Belo Broadcasting Corp.

William D. Sims, Paul C. Watler, Jenkens & Gilchrist, Dallas, Tex., for plaintiff-intervenor A.H. Belo Corp. d/b/a The Dallas Morning News.

Frank C. Vecella, Charles L. Babcock, Michael Knapek, Jackson, Walker, Winstead, Cantwell & Miller, Dallas, Tex., for plaintiffs-intervenors the Times Herald Printing Co. and David Eden.

Robert M. Roller, Graves, Dougherty, Hearon & Moody, Austin, Tex., for defendant Nat. Collegiate Athletic Ass'n.

Robert F. Middleton, Baker, Smith & Mills, Dallas, Tex., for defendant Southwest Athletic Conference.

## ORDER

NOWLIN, District Judge.

The above-styled and numbered cause came before the Court on July 24, 1986 for a non-jury trial.

## BACKGROUND

This action was originally filed in state court on October 3, 1985, and removed to this Court by both Defendants on October 25, 1985. After a pre-trial conference held on February 6, 1986, the Court granted Defendant NCAA's Motion for Separate Trial on the issue of whether Defendants were governmental bodies as defined by the Act and the Plaintiffs' claims brought under 42 U.S.C. § 1983. A non-jury trial was held on March 6 and 7, 1986. On May 15, 1986, 650 F.Supp. 1047 the Court entered a Memorandum Opinion and Order which denied the Plaintiffs' section 1983 claims, determined that both Defendants are governmental bodies within the meaning of the Act, and that the information sought by Plaintiffs is public information within the meaning of the Act. The Order directed that the Defendants produce the information sought by Plaintiffs to the Court for an in camera inspection within twenty days from the date of the Order so that the Court could determine whether any exemptions listed under section 3 of the Act prevented disclosure of the information sought. The Court further required that the Defendants file briefs concerning any exceptions to disclosure available under the Act.

On May 22, 1986 the Defendants filed a Joint Motion to Amend the Court's Order and to Certify an Immediate Appeal to the Circuit Court. On May 30, 1986 the Defendants filed a Motion for Additional Time to Comply with the Court's Order. On June 2, 1986 the Southwest Conference filed a Motion to Vacate the Court's Opinion and Dismiss the Pendent Claims, or in the Alternative, to Remand. On June 3, 1986 the Defendants moved for return of the documents following *in camera* inspection and for conditional stay. The Court granted the Defendants' Motion for Extension of Time and ordered that the documents in issue be submitted to the Court on or before Friday, June 20, 1986 at 5:00 p.m. On June 16, 1986 the Court entered an order which denied the Defendants' Motion to Amend and to Certify an Immediate Appeal and for Stay. On that same day

the NCAA filed its Notice of Appeal of the Court's Order of May 16, 1986. June 17, 1986 saw a great deal of activity in this case. The Court denied Defendant Southwest Athletic Conference's Motion to Vacate Opinion and Dismiss Pendent Claims, or in the Alternative, to Remand. In that Order, the Court noted that following removal of this cause neither Defendant had moved to dismiss the section 1983 claim and remand the state claims. Further, the Order noted that at the trial conducted by the Court the Defendants conceded that this Court had pendent jurisdiction over the Plaintiffs' state law claims. The Court also entered an order which denied the Defendants' Motion for Return of Documents following *in camera* inspection, but granted the motion insofar as it sought protection of the documents pending any appeal of this Court's final order. Finally, the Court scheduled trial of any remaining issues in this case for Thursday, July 24, 1986. On that same day, June 17, 1986, the NCAA moved to stay proceedings in this action pending a decision on a petition for writ of mandamus which they had filed in the United States Court of Appeals for the Fifth Circuit. On June 19, 1986 the United States Court of Appeals for the Fifth Circuit denied the Defendant's petition; therefore, the Court denied the Motion to stay these proceedings as moot.

Pursuant to the Court's scheduling order of June 17, 1986, the parties, with the exception of the SWC, timely filed briefs concerning the remaining issues in this case. The SWC did not submit a brief to the Court.

## I. REMAINING ISSUES

The NCAA asserts some thirty-six (36) defenses in its amended answers. The SWC asserted six (6) affirmative defenses in its amended answer, all of which are also asserted by the NCAA. The NCAA's brief on the remaining issues argues the following five (5) specific defenses:

1. Application of the Act would violate the First, Fifth and Fourteenth Amendments to the United States Constitution and similar provisions of the Texas Constitution.

2. The member institutions should be joined as necessary parties before the Court proceeds.

3. The Court should abstain.

4. The intervenors and Plaintiffs have failed to establish the necessary prerequisites to relief under the Act.

5. The NCAA has a privacy right in the information sought and the documents are protected by a self-critical analysis privilege.

## II. FIRST, FIFTH AND FOURTEENTH AMENDMENT DEFENSES

The NCAA devotes a majority of its argument to allegations that application of the Act violates specific provisions of the United States and Texas Constitutions. Basically, the NCAA asserts three arguments in support of their contentions: First, extraterritorial application of the Act is an unconstitutional infringement by the State of Texas on the private affairs of a Kansas organization; second, the Act provides for an unconstitutional taking of the NCAA's property for private purposes; and, third, the Act infringes the NCAA's fundamental rights of privacy, association and academic freedom without furthering any compelling state interests.

### A. *Extraterritorial application*

On May 15, 1986, this Court ruled that the Act was intended to have extraterritorial effect, and that the Act applies to the NCAA. Nevertheless, the NCAA now argues that application of the Act to the NCAA is unconstitutional. In support of its position that the Texas Legislature cannot constitutionally regulate the affairs of a foreign association, the NCAA cites *Austin Building Co. v. National Union Fire Insurance Co.*, 432 S.W.2d 697 (Tex.1968). In *Austin Building,* the Plaintiff, a Texas corporation, sued the Defendant insurance company for damages sustained in a fire in Kansas. The issue before the Court was one of choice of law. The Court found that the insurance contract in issue was made in

Kansas with a Kansas citizen, would be performed in Kansas, related to property located in Kansas, and that the parties intended that Kansas law would apply. Therefore, the Court held that Kansas law would control interpretation of the contract under the doctrine of *lex loci. Id.* at 701. In the instant case the statute in issue does not attempt to regulate contracts, but rather ensures public access to information concerning the affairs of government and the expenditure or use of State funds. Further, the NCAA has had significant, indeed the most significant, contacts with the State of Texas. The NCAA consistently enters Texas to conduct its business. It has conducted numerous investigations within the State of Texas, often employing Texas residents to conduct such investigations. The documents and information sought by Plaintiffs and Intervenors admittedly came to light pursuant to investigations conducted within the State by NCAA representatives. Finally, and most important, the NCAA receives and expends public funds of the State of Texas. These facts distinguish and render inapposite *Austin Building Co. v. National Union Fire Insurance Co., Id.* The Act was intended to have extraterritorial effect in pursuit of the clear and legitimate public policy stated in the Act.

If, as interpreted by Plaintiff, the NCAA argues that the full faith and credit clause of the United States Constitution bars extraterritorial application, the Court would note that the clause does not require application of another state's law in violation of Texas' own legitimate public policy. *Nevada v. Hall,* 440 U.S. 410, 422, 99 S.Ct. 1182, 1189, 59 L.Ed.2d 416 (1979); *Pacific Employers Insurance Co. v. Industrial Accident Commission,* 306 U.S. 493, 501–02, 59 S.Ct. 629, 632–33, 83 L.Ed. 940 (1939); *Garcia v. Total Oilfield Services, Inc.,* 703 S.W.2d 411, 414–15 (Tex.App.—Amarillo 1986, writ ref'd n.r.e.). If the NCAA argues that the full faith and credit clause demands application of Kansas law, it "assumes the burden of showing, upon some rational basis, that the conflicting interests ... of the foreign state are superior to those of the forum." *Alaska Packers Association v. Industrial Accident Commission,* 294 U.S. 532, 547–48, 55 S.Ct. 518, 523–24, 79 L.Ed. 1044 (1935). When the public interest of the forum state in the persons, property or events subject in the litigation outweigh the interests of the foreign state, there is no denial of full faith and credit. *Id.* In this case the NCAA has not even attempted to meet this burden. This litigation involves Texas residents, Texas state universities and student athletes, and a legitimate Texas public policy. These factors clearly outweigh any policy Kansas might have to protect associations which do extensive business in Texas and receive and expend Texas public funds. Accordingly, the Court is of the opinion that extraterritorial application of the Act is constitutional.

### B. *Unconstitutional Taking*

The NCAA argues that application of the Act results in an unconstitutional taking of private property for a private purpose in violation of the United States and Texas Constitutions. This argument ignores this Court's May 15, 1986 Order which found that the NCAA met the definition of governmental body under the Act, and that the information requested under the Act is public information. The Court is not inclined to reconsider its prior determination; therefore, the NCAA's argument must fail because the information requested is not "private property," but rather public information. Moreover, the NCAA fails to explain how the Plaintiff's and Intervenor's review of public information could possibly result in an unconstitutional "taking." The disclosure sought neither prevents the NCAA from using the information in issue, nor diminishes some advantage which the NCAA holds over some competition. The NCAA has simply failed to demonstrate that an unconstitutional taking would occur. This raises yet another point: A taking could not possibly occur until the Court reviews the information sought and determines which, if any, documents must be

disclosed. To this extent the NCAA's argument is premature.

Even if the court presumed that a "taking" of "private property" occurred, the taking is for a legitimate public purpose and not for "private use." One person's property can be taken, even for the benefit of another private person, so long as there exists a justifying public purpose. *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 241, 104 S.Ct. 2321, 2329–30, 81 L.Ed.2d 86 (1984). Once the Legislature has declared the "public interest" the Courts consider the declaration "well-nigh conclusive." *Berman v. Parker,* 348 U.S. 26, 32, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954). Thus, the public use requirement is considered coterminous with the state's public powers. *Hawaii Housing Authority,* 467 U.S. at 240, 104 S.Ct. at 2329. The courts must defer to the legislature's determination "until it is shown to involve an impossibility." *Old Dominion Land Co. v. United States,* 269 U.S. 55, 66, 46 S.Ct. 39, 40, 70 L.Ed. 162 (1925). The expressed purpose of the Act sets forth a legitimate and vital public interest; disclosure of information concerning the affairs of governmental bodies and the expenditure and use of public funds. Specifically, the information sought in this action also concerns a legitimate public concern; athletic recruiting violations in Texas universities. As noted by the NCAA, "a fundamental purpose of the NCAA is to maintain 'intercollegiate athletics as an integral part of the education program.' *Justice v. National Collegiate Athletic Association,* 577 F.Supp. 356, 361 (D.Ariz.1983)." In this Court's view there is no more vital or legitimate public concern than the education of this State's citizens. The NCAA's "taking" argument is without merit.

## C. *Fundamental Rights*

The NCAA next argues that its "fundamental rights" to privacy, freedom of association and academic freedom are violated by application of the Act and that the Plaintiff must therefore demonstrate a compelling state interest which justifies the Act.

The NCAA appears to assert a substantive due process argument which would require that the Plaintiff demonstrate that the Act is necessary to promote a compelling State interest.

The first step in an analysis of the NCAA's claims is to determine the nature of the rights affected by the Act. The Court must apply strict scrutiny to a statute only when the legislation involves some suspect classification or touches upon some fundamental right. *Mathews v. Lucas,* 427 U.S. 495, 506, 96 S.Ct. 2755, 2762–63, 49 L.Ed.2d 651 (1976); *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973). Where no fundamental rights are affected, the statute need only rationally relate to some legitimate state interest. *Ohio Bureau of Employment Services v. Hodory,* 431 U.S. 471, 489, 97 S.Ct. 1898, 1908–09, 52 L.Ed.2d 513 (1977); *see Pappanastos v. Board of Trustees,* 615 F.2d 219, 221 (5th Cir.1980). The NCAA's argument is based upon the premise that the NCAA itself enjoys the rights of privacy, association, and academic freedom. The Court is of the opinion that this premise is incorrect.

### 1. *Privacy*

All of the parties to this action concede that the NCAA has standing to assert a right of privacy on behalf of those individuals whom its files concern. *Industrial Foundation of South v. Industrial Accident Board,* 540 S.W.2d 668, 678 (Tex. 1976). The NCAA, however, goes one step further and argues that it has a constitutional right to privacy, essentially equivalent to individuals, which would bar application of the Act. Plaintiffs and Intervenors argue that the NCAA has no such privacy right.

The constitutional right to privacy is a developing concept which remains substantially undefined. *Whalen v. Roe,* 429 U.S. 589, 599 n. 24, 97 S.Ct. 869, 876 n. 24, 51 L.Ed.2d 64 (1977). "The cases sometimes characterized as protecting 'privacy' have in fact involved two different kinds of interests. One is the individual interest in

avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of decisions." *Id.* at 598–600, 97 S.Ct. at 876; *e.g., Nixon v. Administrator of General Services,* 433 U.S. 425, 457, 97 S.Ct. 2777, 2797, 53 L.Ed.2d 867 (1977). Certainly, that line of cases recognizing the right to privacy in making certain kinds of decisions does not apply to the NCAA. *Bowers v. Hardwick, et al.,* —— U.S. ——, —— ———, 106 S.Ct. 2841, 2842–44, 92 L.Ed.2d 140 (1986). This line of cases concerns matters of child rearing and education, family relationships, procreation, marriage, contraception and abortion. *Id.* Thus, the NCAA must find support for its argument in that line of cases which prevents disclosure of personal matters.

Assuming the NCAA's argument that corporations, like individuals, are accorded privacy protection under this line of cases, their privacy rights are not equivalent to those of an individual. *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 779 n. 14, 98 S.Ct. 1407, 1416–17 n. 14, 55 L.Ed.2d 707 (1978); *California Bankers Association v. Shultz,* 416 U.S. 21, 65–66, 94 S.Ct. 1494, 1519–20, 39 L.Ed.2d 812 (1974); *Tavoularess v. Washington Post Co.,* 724 F.2d 1010, 1021–22 (D.C.Cir.1984). The extent of a corporation's privacy interest is determined on a case by case basis by balancing the need for disclosure against the invasion occasioned by the disclosure. *Tavoularess,* 724 F.2d at 1023. Less severe intrusions will more likely result in disclosure. *See id.* Only rare cases involving disclosure of trade-secrets and confidential *commercial* information have required demonstration of a compelling interest before disclosure would be allowed. *Id.*

In arguing that their interests outweigh the need for disclosure, the NCAA argues that it would be irreparably harmed by disclosure in that its internal rules would be "emasculated," and that innocent third persons might be harmed by disclosure of unverified information. This must be balanced against the interest in disclosure: the public's interest in full and complete disclosure of information concerning the affairs of governmental bodies as defined by the Act.

First, the NCAA cannot assert possible harm to unrelated third parties in asserting its own privacy interest. It does have standing to raise such interests in claiming an exemption under the Act, *Industrial Foundation,* 540 S.W.2d at 678, but this is irrelevant to an assertion of their own privacy interest. Therefore, they must rely on their "emasculation" argument to outweigh the need for disclosure. It is important to note what the NCAA does not argue. It does not assert, nor could it, that their association would collapse if disclosure is required. By their own admission they are "the only act in town" in their area of intercollegiate athletics. Thus, they cannot argue that some competitor will be advantaged by disclosure. Further, only one facet of their organization, albeit an important facet, would suffer their grim prophesies of "emasculation."

The Court is of the opinion that these possible effects are clearly outweighed by the public's right to information concerning organizations or associations which receive and expend public monies. This interest is heightened by the nature of the information sought. This Court is of the opinion that the public interest in the affairs of their government and in education are important and fundamental. Further, the interest in disclosure of information from an association whose "fundamental purpose ... is to maintain 'intercollegiate athletics as an integral part of the education program,'" NCAA Brief on Remaining Issues at 5, clearly outweighs the prospective harm disclosure might cause the Association. The Court is of the opinion that any privacy interest the NCAA might assert is clearly outweighed by the interests in disclosure.

### 2. *Freedom of Association*

In support of its somewhat vague argument that application of the Act infringes upon their constitutional right of association, the NCAA cites *NAACP v. Alabama,*

357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). In *NAACP* the Court allowed the Plaintiff to assert the associational rights of its members, but found no such inherent right in the NAACP itself. *Id.* at 459, 78 S.Ct. at 1170. The Court found that forced disclosure of the NAACP's membership lists furthered the Defendant's racially discriminatory scheme against the Plaintiff. *Id.* at 462, 78 S.Ct. at 1171–72. In reading this conclusion the Court noted:

> It is important to bear in mind that petitioner asserts no right to absolute immunity from state investigation, and no right to disregard Alabama's laws. As shown by its substantial compliance with the production order, petitioner does not deny Alabama's right to obtain from it such information as the State desires concerning the purposes of the association and *its activities within the State.*

*Id.* at 463–64, 78 S.Ct. at 1172 (emphasis added).

■ Under *NAACP v. Alabama,* the NCAA itself has no constitutional right to association. Even assuming that the NCAA has standing to assert the right of its members, there is absolutely no evidence or allegation that the Act furthers any sort of discriminatory scheme, or affects the lawful exercise of fundamental civil rights. Moreover, the very language of *NAACP v. Alabama* quoted above, suggests that the constitutional right asserted by the NCAA would not protect it from disclosure of the information sought in this suit. The NCAA has failed to establish how application of the Act would or could deprive the NCAA of any freedom of association.

### 3. *Academic Freedom*

The NCAA argues that due process protects the educational process and academic freedom and that application of the Act would abridge this important right. Necessarily, the NCAA must claim the right of academic freedom in order to raise this argument, yet does not explain or even argue how this right protects it from disclosure of the information in issue.

■ Academic freedom has been recognized as a constitutional right implied by the First Amendment and reserved by the Ninth Amendment. *See Keyishian v. Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 683–84, 17 L.Ed.2d 629 (1967). Its parameters, however, are "ill-defined and the case law defining it is inconsistent." *Hillis v. Stephen F. Austin State University,* 665 F.2d 547, 553 (5th Cir. 1982). Basically, the right protects the educational process. *See id.; see also Keyishian,* 385 U.S. at 603, 87 S.Ct. at 683–84; *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963).

The NCAA has failed to demonstrate or offer any direct authority for the proposition that it is an academic institution of any sort entitled to academic freedom. Moreover, the NCAA has failed to demonstrate how the information sought falls within any constitutionally protected "educational process." The mere fact that the NCAA's members are educational institutions does not confer upon the NCAA the right to assert academic freedom as a constitutional defense in this case. A tangential relation to an academic institution does not confer this constitutional right on the NCAA. *In re Dinnan,* 661 F.2d 426 (5th Cir.1981), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2904, 73 L.Ed.2d 1314 (1982).

In short, the NCAA has totally failed to establish that it may assert a constitutional right to academic freedom.

Accordingly, the Court is of the opinion that the NCAA cannot assert the fundamental rights of association and academic freedom. Further, if the NCAA enjoys some limited constitutional privacy interest it is clearly outweighed by the interest in disclosure of the information sought, i.e., disclosure relates to a legitimate state interest.

### III. JOINDER OF ADDITIONAL PARTIES

The NCAA argues for the first time that the member institutions which are the subject of the records sought, claim an interest

in those records and may be prejudiced if not joined in this action pursuant to Federal Rule of Civil Procedure 19. The NCAA acknowledges that two members of their organization have been denied intervention in this action. On February 20, 1986 this Court denied the Motion to Intervene of Rice University, and on February 7, 1986, this Court denied the Motion to Intervene of SMU. Because the present Defendants have standing to raise the defenses available to the member universities, *see Industrial Foundation of the South v. Texas Industrial Accident Board*, 540 S.W.2d 668, 678 (Tex.1976), the Court found that their interests were already adequately represented by the existing Defendants. *Bush v. Viterna*, 740 F.2d 350, 354 (5th Cir.1984).

Rule 19(a) states:

A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.

FED.R.CIV.P. 19(a). "Under the present rule, pragmatic concerns, especially the effect on the parties and on the litigation, control a court's decision on joinder." *Smith v. State Farm Fire and Casualty Co.*, 633 F.2d 401, 405 (5th Cir.1980); *accord Lone Star Industries v. Redwine*, 757 F.2d 1544, 1551–52 (5th Cir.1985). Further, "[a]n interest in disputed property does not make a party indispensable unless in his absence relief is impossible or the absent person is likely to be prejudiced or his absence will lead to multiple litigation." *Moreau v. Oppenheim*, 663 F.2d 1300, 1310 (5th Cir.1981), *cert. denied*, 458 U.S. 1107, 102 S.Ct. 3486, 73 L.Ed.2d 1368 (1982).

Clearly, complete relief can be accorded among those already parties to this action. The Court's decision regarding disclosure of information held by the NCAA and the SWC will not be affected by the absence of any other party. The Court's determination that the member universities are already adequately represented in this action necessitates a finding that they are not so situated that the disposition of this action in their absence will either impair or impede their ability to protect that interest. Moreover, the record is void of any evidence that nonjoinder would leave any of the member universities subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of their claimed interest. FED.R. CIV.P. 19(a). The Court is of the opinion that the NCAA has failed to demonstrate any justification for joinder of additional parties at this time.

## IV. ABSTENTION

The NCAA argues that this Court should abstain from ruling in this case "of first impression" because the case presents "unsettled" questions of state law, and because the Court's interpretation of the Act brings the constitutionality of the Act into serious question.

Both Defendants removed this case from state court on October 25, 1985. The NCAA moved to dismiss this action for failure to state a claim on October 30, 1985; the motion was denied on November 11, 1985. Thereafter, the parties engaged in extensive and expedited pre-trial discovery, filed numerous motions and participated in a pre-trial conference with the Court. On motion of the NCAA the Court bifurcated this action to determine, in the first instance, whether the Defendants were subject to the Act, whether the information sought was "public information," and for trial of those Plaintiffs' civil rights claim. The trial was held on March 6 and 7, 1986. Upon inquiry by the Court both Defendants conceded that this Court had pendent juris-

diction to determine the state law claims. In fact, Defendant SWC expressed overwhelming confidence in the Court's ability to determine these now "complex and novel" issues. The Court entered its Memorandum Opinion and Order which determined these issues on May 15, 1986—and now, after almost nine months of litigation, the NCAA argues that the Court should abstain, apparently pursuant to *Railroad Commission v. Pullman,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

Abstention is an extraordinary and narrow doctrine to be used in rare circumstances. *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). In order to abstain under *Pullman,* "a federal court must find that the case presents a difficult, obscure, or unsettled issue of state law, the resolution of which could eliminate or substantially narrow the scope of the federal constitutional issue." *Nissan Motor Corp. v. Harding,* 739 F.2d 1005, 1009 (5th Cir.1984). Merely because the state courts have not interpreted a statute is not determinative; if the state law in question is clear the federal court should exercise its jurisdiction. *Harman v. Forssenius,* 380 U.S. 528, 534–35, 85 S.Ct. 1177, 1181–82, 14 L.Ed.2d 50 (1965).

█ First, the Court is of the view that this motion is untimely. Second, the Court is of the view that while this cause may be one of first impression, it does not present issues of state law which are so difficult, obscure or unsettled as to require abstention. Finally, the Court retained jurisdiction over the state claims partially at the behest of the Defendants who removed the action to this Court. Under *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Court properly asserted jurisdiction over the pendent state claims because the federal claim was of sufficient substance to confer subject matter jurisdiction on this Court, and the state and federal claims clearly arose from a common nucleus of operative facts. *Id.* at 725. The state law claims have been

fully litigated and are properly before this Court. In such cases

[p]rinciples of judicial economy, convenience, and fairness to the litigants suggest that a court should be reluctant to dismiss a pendent claim once substantial time and resources have been devoted to such claims and the court has heard the evidence and arguments on such issues. '[G]iven the advantages of economy and convenience and no unfairness to litigants, Gibbs contemplates adjudication of these claims.' *Brown v. Knox,* 547 F.2d 900, 903 (5th Cir.1977), *quoting Hagans v. Lavine,* 415 U.S. 528, 545, [94 S.Ct. 1372, 1383, 39 L.Ed.2d 577] (1974).

*Caserta v. Village of Dickinson,* 672 F.2d 431, 433 (5th Cir.1982). This case is properly before this Court; the Defendants abstention argument, presented belatedly and with clear vision of hindsight, is meritless.

## V. PLAINTIFFS' SATISFACTION OF PROCEDURAL PREREQUISITES

The NCAA contends that Intervenors A.H. Belo Corp., and David Eden and The Times Herald Printing Co. failed to request from the NCAA the information they seek before intervening in this suit. The NCAA concedes that Plaintiffs Kneeland and Belo Broadcasting Corp. complied with these procedural prerequisites. Further, the NCAA argues that it should now be given an opportunity to request an Attorney General's opinion pursuant to section 7.

Section 4 of the Act requires that an individual make application to inspect records at the offices of the custodian of records. TEX.REV.CIV.STAT.ANN. art. 6252–17a, § 4 (Vernon Supp.1986). If the governmental body receives a request for information it believes to be exempt from disclosure, it may request an opinion of the Attorney General as to application of specific exemptions. *Id.* § 7. The governmental body must request the Attorney General's opinion within ten days of the application for inspection. If the governmental body refuses to seek an Attorney General's opinion, or to supply the requested information, the applicant may seek a writ of mandamus compelling disclosure.

The record reflects that Intervenor A.H. Belo Corp. intervened in the state action against the SWC only, on October 14, 1985. On November 8, 1985 A.H. Belo Corp. made a written request of the NCAA. On November 20, 1985, A.H. Belo Corp. amended its complaint to seek a mandamus against the NCAA. The amended complaint was filed more than ten days after A.H. Belo Corp. made its request of the NCAA; therefore, A.H. Belo Corp. complied with the procedural prerequisites of the Act.

 The Times Herald Printing Co. and David Eden intervened in the state action on October 17, 1985. These intervenors requested specific information from the NCAA on October 14, 1985. The Times Herald argues that it was not granted permission to intervene in the state proceedings until October 25, 1985, more than ten days after their written request. Under the Texas Rules of Civil Procedure any party may intervene in an action subject to being stricken by the Court upon motion. TEX.R.CIV.P. 60. Thus, it appears that The Times Herald became a party in the state action on October 17, 1986. This conclusion, however, does not compel a finding that The Times Herald has failed to satisfy the necessary procedural prerequisites to their action. Section 7(a) of the Act provides that upon receipt of a request under the Act "the governmental body within a reasonable time, no later than ten days" must request an Attorney General's opinion. TEX.REV.CIV.STAT.ANN. art. 6252–17a, § 7. If the governmental body refuses to request an opinion, to supply the information requested, or to release information declared public by the Attorney General, the person requesting the information may seek a writ of mandamus compelling disclosure. Id. § 8. The Act states that the governmental body shall seek an Attorney General's opinion within a reasonable time; it does not necessarily require that the governmental body have ten days to seek an opinion. Id., § 7. Even if The Times Herald sought mandamus only three days after making its request, the Court is of the opinion that the NCAA had a reason-able amount of time to seek an Attorney General's opinion in light of the circumstances of this case. The record reflects that Plaintiff Kneeland made her request of the NCAA four months prior to seeking mandamus; the NCAA never sought an Attorney General's opinion during that period. Intervenor A.H. Belo Corp. waited in excess of ten days after its request was made before seeking mandamus; again, the NCAA made no attempt to obtain an Attorney General's opinion. All of the requests sought substantially similar information. Under these facts it is clear that the NCAA never intended to request an Attorney General's opinion. In fact, it has been the NCAA's position that they need not seek such an opinion. The Court, therefore, is of the opinion that the NCAA was allowed a reasonable time in which to seek an Attorney General's opinion before Intervenor Times Herald joined the state action.

The NCAA's assertion that it should now be allowed to seek an Attorney General's opinion as to whether they are a governmental body is equally meritless. Section 8 states that if a governmental body refuses to request an Attorney General's opinion, or to provide the information requested, the party who made the request may seek a writ of mandamus. The record clearly establishes that this scenario occurred and that the Plaintiffs and Intervenors properly sought a writ of mandamus pursuant to section 8. It would strain reason and be an unseemly waste of time, effort and resources of all of the parties to allow the NCAA to now seek an Attorney General's opinion.

Accordingly, the Court is of the view that the Plaintiff and the Intervenors have met the necessary statutory prerequisites to filing this action, and that the NCAA is not entitled to seek an Attorney General's opinion at this late date.

## VI. VALIDITY OF THE ACT UNDER ARTICLE II AND V OF THE TEXAS CONSTITUTION

 Both Defendants allege without argument or authority that the Act violates

article II of the Texas Constitution in that it "purports to bestow judicial powers and authority upon the Attorney general who is a member of the executive branch of Government," as well as article V, section I of the Texas Constitution in that it "purports to bestow judicial powers and authority in an entity other than one of the Courts specified in the Texas Constitution." Apparently, both purported violations arise from section 7's requirement that the Attorney General render decisions concerning application of the exceptions set out in section 3 of the Act.

The Court must presume the constitutionality of an act of the legislature. *Texas Public Building Authority v. Mattox,* 686 S.W.2d 924, 927 (Tex.1985); *Smith v. Davis,* 426 S.W.2d 827, 831 (Tex.1968). Therefore, the burden is on the party attacking the statute as unconstitutional. *Texas Public Building Authority,* 686 S.W.2d at 927 (*citing Robinson v. Hill,* 507 S.W.2d 521, 524 (Tex.1974)). The Court will declare a statute unconstitutional only when it is prohibited by a specific provision of the Constitution, "or such is clearly implied." *Id.* at 927. The separation of powers provisions of the Texas Constitution are violated "when the [function] of the judicial process in a field constitutionally committed to the control of the courts is interfered with by the executive or legislative branches...." *State Board of Insurance v. Betts,* 158 Tex. 88, 308 S.W.2d 846, 851–52 (1958) (Norvell, J.); *accord Coates v. Windham,* 613 S.W.2d 572, 576 (Tex.Civ.App.—Austin 1981, no writ).

Section 7 of the Act provides that upon request of a governmental body, the Attorney General shall issue an opinion as to whether the information requested must be disclosed. TEX.REV.CIV.STAT.ANN. art. 6252–17a, § 7 (Vernon Supp.1986). Article 4, section 22 of the Texas Constitution authorizes issuance of such opinions. Section 22 reads, in pertinent part, that the Attorney General "shall ... give legal advice in writing to the Governor and other executive officers, when requested by them, and perform other such duties as may be required by law." TEX. CONST. art. IV,

§ 22. The interpretive commentary which follows this provision of the Constitution states: "The Attorney General ... performs two principal functions: 1. the giving of legal advice in the form of opinions to the governor, heads of departments and state institutions, committees of the legislature, and county authorities; ..." TEX. CONST. art. IV, § 22, interp. commentary (Vernon 1984). Further, article 4399 requires that the Attorney General render written opinions to certain individuals about questions which affect the public interest. TEX.REV.CIV.STAT.ANN. art. 4399 (Vernon Supp.1986). Therefore, the Attorney General is authorized to issue opinions by constitutional and statutory authority. TEX. CONST. art. IV, § 22; *Plainview Independent School District v. Edmonson Wheat Growers, Inc.,* 681 S.W.2d 299, 302 (Tex.App.—Amarillo 1984, writ ref'd n.r.e.). Opinions of the Attorney General are not conclusive determinations of the law, but rather persuasive opinions. *Heard v. Houston Post Co.,* 684 S.W.2d 210 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.); *City of Houston v. Houston Chronicle Publishing Co.,* 673 S.W.2d 316 (Tex.Civ.App.—Houston [1st Dist.] 1984, no writ). The Attorney General has no authority to enforce his opinions; they are merely advisory. *See Guerra v. McClellan,* 250 S.W.2d 241, 243 (Tex.Civ. App.—San Antonio 1952), *aff'd,* 152 Tex. 373, 258 S.W.2d 72 (1953). This fact was obviously recognized by the legislature when it provided that a governmental body which refused to comply with an Attorney General's opinion would be subject to a writ of mandamus. TEX.REV.CIV.STAT. ANN. art. 6252–17a, § 8 (Vernon Supp. 1986).

The opinions of Texas Courts are obviously binding and enforceable, TEX. CONST. art. V, § 1, however, they may not issue advisory opinions. *Id.* art. II, § 1; *Employees Retirement System v. McDonald,* 551 S.W.2d 534, 536 (Tex.Civ.App. —Austin 1977, writ ref'd). The Act requires that the Attorney General issue advisory opinions which are authorized by

constitutional and statutory authority. The Texas judiciary is precluded from issuing such opinions. The Act does not grant judicial authority to the Attorney General, and therefore, does not violate article II or article V of the Texas Constitution.

## VII. OTHER DEFENSES

The NCAA's answers contain the following defenses which have not been addressed in this order or the Court's May 15, 1986 Memorandum Opinion: waiver; preemption; abrogation of the contracts and privileges and immunities clauses of the United States Constitution; the privilege of self-critical analysis; and, violations of the clean hands and good faith doctrines. None of these defenses have been extensively briefed or argued. There is absolutely no evidence that the Plaintiffs or Intervenors waived any rights they have under the Act. Likewise, there is no evidence which supports the NCAA's claim that the Act is preempted by some unspecified federal statute, or that application of the Act will interfere with their constitutional right to contract or abridge their rights under the privileges and immunities clause. Therefore, the Court is of the opinion that these defenses will not bar application of the Act.

Because this action seeks mandamus, an equitable remedy, the NCAA alleges that the Plaintiffs and Intervenors have not acted in "good will" and do not have "clean hands." *Industrial Foundation*, 540 S.W.2d at 674. In Open Records Act cases, however, these equitable defenses are given no weight because "[t]he legislative intent of making public information available to *any person* would be thwarted if a court were allowed to consider the requestor's motives even though the custodian may not do so." *Id.* at 674 n. 5. These defenses are not applicable to this action.

Finally, the NCAA asserts a privilege of self-critical analysis as a bar to application of the Act. This privilege protects against disclosure of records generated as a result of internal investigation. *See Bredice v. Doctors Hospital, Inc.*, 50 F.R.D. 249 (D.D. C.1970), *aff'd*, 479 F.2d 920 (D.C.Cir.1973); Note, *The Privilege of Self-Critical Analysis*, 96 HARV.L.REV. 1083 (1983). The NCAA suggests that the privilege shields disclosure when the information results from a critical self-analysis undertaken by the party seeking protection, the public has a strong interest in preserving the free flow of the information sought, and discovery of the information would curtail its flow. NCAA Brief in Support of Exceptions at 20. The NCAA has offered no authority from this circuit which specifically recognizes this privilege. *In re LTV Securities Litigation*, 89 F.R.D. 595, 614–18 (N.D.Tex.1981), is cited as support for recognition of the privilege; however, that case is squarely grounded upon an analysis of the attorney-client and work product privileges. Moreover, even if the Court were persuaded that such an amorphous privilege existed in this Circuit and that it might apply to bar application of the Act, the NCAA has not established the criteria it cites for application of the privilege. In this case the "self-critical analysis" was done by the schools themselves or was a product of the NCAA investigating the schools. It was not a product of the NCAA investigating itself. Further, the Court would find it difficult to declare that the public had an interest in maintaining the confidential flow of this information. The Court is of the view that the privilege of "self-critical analysis," if any, is not a constitutional bar to disclosure of this information.

## VIII. CONCLUSION

Accordingly, the Court is of the opinion that the Defendants have failed to establish any defense which will bar disclosure of the information sought. The Court expresses no opinion as to the exceptions claimed by the Defendants under the Act, but will issue a separate opinion on those claims.