Carole KNEELAND, Belo Broadcasting Corporation, the Times Herald Printing Company, David Eden and A.H. Belo Corporation d/b/a Belo Corporation News

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION and Southwest Athletic Conference.

Civ. No. A–85–CA–616.

United States District Court,
W.D. Texas,
Austin Division.

Nov. 4, 1986.

See also 650 F.Supp. 1047 and 650 F.Supp. 1064.

**1078**

Robert M. Roller, Graves, Dougherty, Hearon & Moody, Austin, Tex., for defendant National Collegiate Athletic Assn.

Robert F. Middleton, Baker, Smith & Mills, Dallas, Tex., for defendant Southwest Athletic Conference.

Jack Balagia, Jr., James R. Raup, McGinnis, Lochridge & Kilgore, Austin, Tex., for plaintiffs Carole Kneeland and Belo Broadcasting Corp.

William D. Sims, Paul C. Watler, Jenkens & Gilchrist, Dallas, Tex., for plaintiff-intervenor A.H. Belo Corp., d/b/a The Dallas Morning News.

Frank C. Vecella, Charles L. Babcock, Michael Knapek, Jackson, Walker, Winstead, Cantwell & Miller, Dallas, Tex., for plaintiffs-intervenors The Times Herald Printing Co. and David Eden.

## MEMORANDUM OPINION AND ORDER

NOWLIN, District Judge.

### I. BACKGROUND

On May 15, 1986, 650 F.Supp. 1047 this Court entered a Memorandum Opinion and Order which determined, among other things, that the Defendants in this action were governmental bodies for purposes of the Texas Open Records Act (the Act), and that the information sought by Plaintiffs and Intervenors is public information. Thereafter, the Defendants produced the information sought for an *in camera* inspection and claimed that virtually all of the information is exempt from disclosure under the exceptions set forth in section 3(a) of the Act. On July 24, 1986, the remaining issues and defenses were tried to the Court. In a Memorandum Opinion and Order filed on August 18, 1986, 650 F.Supp. 1064, the Court overruled the defenses asserted by Defendants. The final task before the Court is to determine whether any of the exceptions asserted by the Defendants preclude disclosure of the information sought by Plaintiffs and Intervenors.

### II. THE BURDEN

■ In making this final determination, the Court must first inquire into what burden is necessary to establish an exception, and upon whom that burden rests. The key to such inquiry in this case lies in an analysis of section 7 of the Act which recites:

(a) If a governmental body receives a written request for information which it considers within one of the exceptions stated in Section 3 of this Act, but there has been no previous determination that it falls within one of the exceptions, the governmental body within a reasonable time, no later than ten days, after receiving a written request must request a decision from the attorney general to determine whether the information is within that exception. If a decision is not so requested, the information shall be presumed to be public information.

(b) The attorney general shall forthwith render a decision, consistent with standards of due process, to determine whether the requested information is a public record or within one of the above stated exceptions. The specific information requested shall be supplied to the attorney general but shall not be disclosed until a final determination has been made. The attorney general shall issue a written opinion based upon the determination made on the request.

TEX.REV.CIV.STAT.ANN. art. 6252–17a, § 7 (Vernon Supp.1986). Plaintiffs and Intervenors argue that because the Defendants failed to seek an attorney general's opinion the presumption set out in section 7(a) is applicable. Defendant SWC points out that section 7 provides no specific di-

rection to an entity which contests its status as a governmental body, and therefore argues that the presumption is inapplicable. Defendant NCAA takes no firm position on application of the section 7 presumption, but rather argues that any presumption created is rebuttable and not conclusive.

Resolution of this issue is, at best, difficult. Indeed, the Act provides no specific direction to an organization which contests its status as a governmental body. The SWC's argument that it is unjust to apply the presumption to an organization that "has an honest and good faith belief that it is not subject to TORA," is at first blush somewhat appealing. Further analysis, however, diminishes the argument.

The Legislature obviously intended that the attorney general initially decide whether information sought from a governmental body falls within an exception to disclosure. Section 7 does not allow a requestor to seek an attorney general's opinion. *Id.* § 7. If the governmental body refuses to request an attorney general's opinion the information is presumed to be public and the requestor may seek a writ of mandamus which compels disclosure if the information is not released. *Id.* §§ 7(a), 8. The Legislature obviously placed the presumption in the Act as a means of forcing governmental bodies to seek the opinion of the state attorney general.

Adoption of the SWC's argument could effectively eliminate the role of the attorney general in the Act. Under their argument any organization could assert an "honest" belief that it is not a governmental body under the Act, refuse to request an attorney general's opinion and force the requestor to seek mandamus in district court without benefit of the presumption. The SWC has cited no authority which supports its argument nor has any authority

been found by the Court. A careful review of Attorney General Opinions and Open Records Decisions demonstrates that from the inception of the Act, the attorney general has determined whether entities or organizations are governmental bodies. *E.g.*, OP. TEX. ATT'Y GEN. NOS. H–554 (1975), H–450 (1974); ORD–228 (1979), ORD–1 (1973). It is clear from reading Attorney General Opinions and Open Records Decisions that the threshold issue the attorney general must determine is whether the body from whom information is sought is a governmental body. Both logic and precedent dictate that the attorney general is authorized to make this determination. Further, there is no authority for the proposition that the attorney general is not authorized to make this determination. Thus, when an organization contests its status as a governmental body and refuses to seek an Attorney General Opinion, a later determination at a mandamus action brought pursuant to section 8 that the organization is a governmental body raises the presumption that the information sought is public.[1]

Intervenor Times Herald Printing Company argues that the Legislature intended the presumption of Section 7(a) to be conclusive. The applicable authorities do not support this proposition. Texas courts have consistently allowed a governmental body which failed to make a proper section 7(a) request the opportunity to rebut the presumption. *City of Houston v. Houston Chronicle Publishing Co.,* 673 S.W.2d 316, 324 (Tex.App.—Houston [1st Dist.] 1984, no writ); *Hutchins v. Texas Rehabilitation Comm'n,* 544 S.W.2d 802, 803 (Tex. Civ.App.—Austin 1976, no writ). Open Records Decision 319 clearly sets out the burden necessary to overcome the presumption: "[T]his presumption could be overcome by a compelling demonstration

---

1. In light of the authority cited in the Court's opinion of May 15, 1986, it is at least curious that the SWC would argue that it had a "honest and good faith belief" that it was not a governmental body under the Act. The Court is of the opinion that the SWC falls squarely within the definition of governmental body and that the applicable authority supports that determination. The Court makes no comment on whether the NCAA had an "honest and good faith belief" that they were not a governmental body as the NCAA does not argue application of the presumption, but rather the effect of the presumption.

that the requested information should not be made public." TEX. ATT'Y GEN. ORD–319 (1982); *e.g.*, TEX. ATT'Y GEN. ORD–26 (1974). Accordingly, the information sought is presumed to be public information; the presumption may be overcome by the Defendants only by a compelling demonstration that the information sought by Plaintiffs and Intervenors should not be released.

### III. EXEMPTIONS

Pursuant to the Court's Order of May 15, 1986, Defendants filed a list of exceptions that, they argue, apply to the subject documents. The Defendants assert no exception is applicable to certain documents. The Court hereby Orders that those documents be disclosed. Further, the SWC asserts that several documents relate to on-going investigations. The records submitted by the NCAA apparently relate to completed investigations. Only that information which relates to completed investigations is public and must be disclosed. *See* TEX.REV.CIV.STAT.ANN. art. 6252–17a, § 6(1) (Vernon Supp.1986).

Defendant NCAA argues that virtually every document falls within one of the following exceptions: 3(a)(1), information deemed confidential by law, within constitutional, statutory, or by judicial decision; 3(a)(11), inter-agency or intra-agency memorandums or letter which would not be available by law to a party other than one in litigation with the agency; 3(a)(14), student records at educational institutions; and education records exempt from disclosure under section 14(e). Likewise, Defendant SWC argues that the vast majority of the documents submitted for *in camera* inspection fall within the following exceptions: 3(a)(1); 3(a)(8), records of law enforcement agencies and prosecutors that deal with the detection, investigation, and prosecution of crime; 3(a)(11); and section 14(e).

The Defendants, as custodians of the information sought by Plaintiffs and Intervenors may assert any of the exceptions necessary to protect their interests as well as those of third parties not associated with them. *Industrial Foundation of the South v. Texas Industrial Accident Board,* 540 S.W.2d 668, 678 (Tex.1976), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1550, 51 L.Ed.2d 774 (1977); *Hubert v. Harte-Hanks Texas Newspapers, Inc.,* 652 S.W.2d 546, 548 (Tex.App.—Austin 1983, writ ref'd n.r.e.). The Court will discuss the applicability of each exception asserted, and then specifically rule on the applicability of the exceptions asserted.

A) *Section 3(a)(1); Confidential Information*

Section 3(a)(1) exempts from disclosure "information deemed confidential by law, either Constitutional, statutory or by judicial decision." TEX.REV.CIV.STAT.ANN. art. 6252–17a, § 3(a)(1) (Vernon Supp.1986). The NCAA asserts that it is entitled to withhold disclosure of the documents sought based upon the federal constitutional right to privacy. Both Defendants argue that the information sought is protected by the state common law right to privacy.

1) *Constitutional Right to Privacy*

■ The NCAA first argues that the information given them by various individuals was conveyed under a pledge of confidentiality and is therefore entitled to constitutional protection. This is clearly a factor to be considered when the Court balances the interests of Plaintiffs, Intervenors and Defendants, but it is not by any means a conclusive factor. *See Robles v. Environmental Protection Agency,* 484 F.2d 843 (4th Cir.1973) (FOIA case); *Fadjo,* 633 F.2d at 1176. Such promises may likewise be considered under Texas law. Promises of confidentiality will not prevent disclosure of information under the Act, unless they are specifically authorized by law. OP. TEX. ATT'Y GEN. H–258 (1974); ORD–554 (1975).

■ Next, the NCAA argues that because the information contains private embarrassing facts it deserves constitutional protection. The United States Constitution prohibits governmental intrusion into an

individual's private affairs. *See Whalen v. Roe,* 429 U.S. 589, 598–602, 97 S.Ct. 869, 875–877, 51 L.Ed.2d 64 (1977); *Paul v. Davis,* 424 U.S. 693, 713, 96 S.Ct. 1155, 1166, 47 L.Ed.2d 405 (1976); *Ramie v. City of Hedwig Village,* 765 F.2d 490, 492 (5th Cir.1985); *Fadjo v. Coon,* 633 F.2d 1172, 1175–77 (5th Cir.1981). The right to privacy consists of two interrelated strands: the individual's right to avoid disclosure of personal matters, and the individual's interest in independence in making certain important decisions. *Fadjo,* 633 F.2d at 1175 (*quoting Whalen,* 429 U.S. at 599–600, 97 S.Ct. at 876–877). "Both strands may be understood as aspects of the protection which the privacy right affords to individual autonomy and identity. [The disclosural] strand, however, described by this circuit as 'the right to confidentiality,' is broader in some respects." *Fadjo,* 633 F.2d at 1175 (citations omitted). The decision-making strand of the privacy right is narrow and concerns matters such as "marriage, procreation, contraception, family relationships, and child rearing and education." *Whalen,* 429 U.S. at 600, n. 26, 97 S.Ct. at 877, n. 26 (*quoting Paul,* 424 U.S. at 713); *e.g., Bowers v. Hardwick,* —— U.S. ——, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986). The disclosural strand is broader and includes matters which fall outside the decision-making strand, yet implicate the individual's interest in nondisclosure. *See e.g., Nixon v. Administration of General Services,* 433 U.S. 425, 455, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977) (disclosure of personal information and personal finances); *Du-Plantier v. United States,* 606 F.2d 654, 669–71 (5th Cir.1979) (financial disclosure within scope of disclosural strand); *Plante v. Gonzalez,* 575 F.2d 1119, 1132 (5th Cir. 1978) (financial disclosures). While this strand is broader, "the privacy interest [which it protects] is weaker than that found wanting in *Whalen v. Roe....*" *Nixon,* 433 U.S. at 458, 97 S.Ct. at 2797.

The NCAA claims that virtually *all* of the information sought by Plaintiffs and Intervenors contains private facts about third parties, and by extension, private facts about the NCAA which cannot be inquired into or disclosed pursuant to state law absent some legitimate and proper governmental concern. The Court's *in camera* review of the information sought, confirms that it contains large amounts of personal and financial information concerning students, student-athletes, university employees, university alumni, as well as other private individuals. The Court must determine whether the invasion of privacy inherent in disclosure of this information outweighs any *legitimate interest* asserted by Plaintiffs and Intervenors through the Act. *Whalen,* 429 U.S. at 492, 97 S.Ct. at 2815; *Fadjo,* 633 F.2d at 1176; *Plante,* 575 F.2d at 1134 (more than mere rationality must be demonstrated). In this regard the NCAA will establish a "compelling demonstration" and meet its burden if it demonstrates that the legitimate public interest is outweighed by the interest they assert. *See* TEX. ATT'Y GEN. ORD–71 (1975).

2) *Legitimate Public Interest v. Interesting Information*

The Plaintiffs and Intervenors characterize the Defendants as organizations that demonstrate an "arrogant attitude" that the public has no legitimate interest in their regulation of intercollegiate recruiting practices. The Defendants characterize Plaintiffs and Intervenors as a sensationalistic and unscrupulous press interested only in "selling newspapers" with no real concern about the best interest of the public or intercollegiate athletics. They allege Plaintiffs seek only information which the public finds curious or interesting, not information which must be disclosed because of a legitimate public interest or concern. Somewhere between these polarized views lies the real intent of each party; an intent which this Court cannot and will not devine; first, because it is not particularly relevant to these proceedings, and second, because it is most likely impossible to conclusively determine. The fact that there now exists a "nationwide scandal" engulfing intercollegiate recruiting practices, and that the public has a legitimate, indeed compelling, interest in that controversy

need not be devined; both are readily apparent.

The nationwide concern over intercollegiate athletics extends well beyond scandals in recruiting. The public controversy and concern essentially involves the proper role of athletics at our universities and in the adequate education of our nation's young people. The Court is of the firm belief that education is the cornerstone upon which the future of this country rests. The public can have no more legitimate concern than a concern for the proper education of its young people. The actions of an organization or association whose "fundamental purpose ... is to maintain intercollegiate athletics as an integral part of the education program," NCAA Brief on Remaining Issues at 5, necessarily affects education and the educational process. The public, then, necessarily has some interest in the activities of that organization. When that organization is "the only act in town" ultimately responsible for enforcement of rules and imposition of sanctions against public and private educational institutions, the public interest in the activities of that organization increases almost exponentially. There is no question that the public has a legitimate and vital concern about education, the role of athletics in education, and specifically the nationwide scandal involving recruiting violations.[2]

The record contains substantial evidence to support this Court's determination that recruiting violations are matters of substantial public concern. Congress has investigated recruiting violations. Indeed members of the NCAA Enforcement Committee have been called before Congress to testify about enforcement proceedings. *NCAA Enforcement Program: Hearings Before the Subcommittee on Oversight and Investigation of the House Committee on Interstate and Foreign Commerce*, 95th Cong., 2d Sess. (1978). This Court has taken notice of numerous articles and publications which address the subject. *E.g.*, Gaona, *The National Collegiate Athletic Association: Fundamental Fairness and the Enforcement Program*, 23 ARIZ.L. REV. 167 (1983); Remington, *NCAA Enforcement Procedures Including the Role of the Committee on Infractions*, 10 J.C. & UNIV.LAW 181 (1983); Comment, *Compensation for Collegiate Athletes: A Run for More than the Roses*, 22 SAN DIEGO LAW REV. 701 (1985); J. Michener, *Sports in America* 183–333 (1976).

Moreover, the controversy has been recognized by at least one other court. *Barry v. Time, Inc.*, 584 F.Supp. 1110 (N.D.Ca. 1984). In that suit, Plaintiff brought a libel action against Time, Inc. Under *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Court was required to determine whether the controversy in issue was a "public controversy." *Id.* at 1115. The Court found that the concern over the role of athletics in our universities was not simply a matter of interest to the public, but rather was a "real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." *Barry*, 584 F.Supp. at 1116–17 (*quoting Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287 (D.C.Cir.), *cert. denied*, 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980). As Judge Patel aptly stated:

> Furthermore, this controversy must be viewed in the context of the larger public debate over the proper role of athletic programs at institutions of higher learning. For many years, critics of bigtime collegiate athletics have commented on what they perceived to be the incongruity of a "win at all costs" attitude, and the concomitant infractions of NCAA rules such an attitude engenders at educational institutions, which are at the same time attempting to instill some sense of civic virtue in their students. Conversely, supporters of major collegi-

---

**2.** One need go no farther than the State of Texas to find an example of the public's concern about education and the role of athletics in education. Recently, the role of athletics and other extracurricular activities became paramount to the basic educational needs of our children. The public concern and outcry became so great that the Texas Legislature responded by enacting the so-called "no pass, no play rule." TEX.EDUC. CODE ANN. § 21.920 (Vernon 1984).

ate athletic programs have noted that such programs provide an opportunity for student-athletes to obtain an education which might otherwise be unavailable to them, while at the same time boosting school morale and providing needed revenues.

*Id.* at 1116–17 (footnote omitted).

Against these public concerns, the Court must weigh the privacy interest of the NCAA and the individuals from or about whom information was collected by the NCAA.

The Court has already determined that the NCAA's privacy interest, to the extent that it exists, does not outweigh the public interest and the need for disclosure in this case. *Kneeland et al. v. NCAA, et al.*, 650 F.Supp. 1064, 1068–69 (W.D.Tex.1986). The Court must next determine whether the privacy interests of certain individuals, as asserted by the NCAA, outweigh the public interest and prevent disclosure. The documents submitted for *in camera* inspection contain financial information, allegations of misconduct and responses thereto as well as other information which would doubtless be characterized as private, intimate or embarrassing by the individuals who are the subject of the information. Basically, the information concerns four (4) groups of individuals: students and their families; coaches, staff and university employees; alumni or "boosters;" and sources of information or "informers." In balancing the interests of all parties the best resolution to this dispute requires a judgment which protects the privacy interests asserted and satisfies the legitimate interests of the public in disclosure of the information as asserted by the Plaintiffs and Intervenors through the Act. *See Industrial Foundation*, 504 S.W.2d at 686.

The information submitted for *in camera* inspection contains voluminous personal, financial and biographical data about prospective student-athletes, student-athletes, and their families. The vast majority of the student-athletes or prospective student-athletes named in the NCAA investigation files are persons who were the subjects of recruiting violations, not the perpetrators of violations nor individuals who sought improper recruitment incentives. The Plaintiffs and Intervenors do not state any legitimate interest in discovering the identities of these persons much less their personal, financial, or biographical data. Disclosure of improper activity or recruiting practices, on the other hand, will necessarily aid the general public, parents, athletes, coaches, teachers, counselors, recruiters, alumni and boosters in understanding specific violations and preventing violations and illegal practices before they are consummated. The Court can perceive no legitimate public interest in disclosure of the identity or personal data of students or their families. Consequently, the Court will Order that the names of all students, student-athletes, prospective student-athletes, as well as the names of their family members, be redacted from the information ordered disclosed by this Court. In addition, all transcripts, phone numbers, bank account numbers, social security numbers, student numbers, geographical and biographical data which tend to identify any student, student-athlete, prospective student-athlete or any member of their family shall be redacted from the information ordered disclosed by this Court. The Court would note that it is sorely tempted to order the release of the names of those students who solicited improper recruitment and especially the names of parents and family members who solicited improper recruitment. Those who seek to purposefully profit from a corrupt system are themselves corrupt and their actions are despicable. It is especially disheartening to read of parents who use their children's skills solely for the parents' economic gain and at great and lasting cost to their children. The Court, however, is of the opinion that exposure of these pathetic activities would only cause greater harm to those the Court, and presumably all parties, seek to protect—the student athlete.

The public's legitimate interest in the information about the other specified group members' involvement in recruiting violations is much more apparent. High school and college coaches, staff members and employees often have the most direct contact with student athletes, prospective student-athletes, recruiters and parents. They often have the best overall picture of the recruiting process. Generally, they are either the parties who commit recruiting violations or the first to be aware that violations have occurred. Likewise, alumni and "boosters" are often the first to know about recruiting violations; especially when they offer improper incentives. Informers or others who provide information about recruiting violations obviously have some first-hand knowledge of recruiting violations. Often these individuals initiate the investigative process.

Some of the information collected by the NCAA contains intimate, personal or financial information about these individuals. Their limited disclosural privacy right does not outweigh the public's legitimate interest in the information sought by Plaintiffs and Intervenors. The public has a legitimate interest in knowing who recruits illegally, how these unscrupulous individuals operate, which institutions tolerate or encourage such activity, and what, if any, sanctions are imposed upon these individuals or institutions when discovered. Further, student-athletes and recruits as well as their parents have a legitimate interest, if not a great need, for this information. They should be aware of the tactics and techniques of over-zealous alumni, boosters, and coaches. They need to know what type of inducements are illegal, and they need to be aware of the sanctions imposed upon violations. Further, alumni and boosters of all institutions have a legitimate interest in knowing the circumstances of violations as well as the identity of violators. Such public knowledge will facilitate compliance with recruiting rules and discourage similar violations. The limited disclosural privacy rights of the individuals named in the information sought by Plaintiffs and Intervenors, pale in the face of

these legitimate public interests. These important interests require disclosure of the information in issue with the exception of the information noted earlier.

### 3) *State Common Law Privacy*

■ Both Defendants assert that the information at issue is excepted from disclosure under section 3(a)(1) of the Act because it is protected by Texas common law. Specifically, the Defendants allege that the "private and embarrassing facts" concept as well as the "false light" privacy concept bar disclosure of the information at issue.

The Texas Supreme Court addressed these concepts in *Industrial Foundation of the South v. Texas Industrial Accident Board,* 540 S.W.2d 668, 682 (Tex.1976) (*citing Billings v. Atkinson,* 489 S.W.2d 858 (Tex.1973)). The Court established a two-prong test to determine whether otherwise public information could be deemed confidential under state common law. First, the information must contain "highly intimate or embarrassing facts about a person's private affairs such that its publication would be highly objectionable to a person of ordinary sensibilities." *Id.* at 685. Second, the information must not be of legitimate concern to the public. *Id.* Both requirements must be met before the information will be protected. *Id.;* TEX. ATT'Y GEN. ORD–423 (1984); ORD–400 (1983); *see Calvert v. Employees Retirement System of Texas,* 648 S.W.2d 418 (Tex.App.—Austin 1983, writ ref'd n.r.e.). The Court noted that once the first prong was established, the burden would fall upon the requestor to establish a legitimate public concern. *Id.* In this case, however, Defendants did not request an attorney general's opinion pursuant to section 7(a). Therefore, this burden shifts to Defendants. TEX.REV.CIV. STAT.ANN. art. 6251–17a, § 7(a) (Vernon Supp.1986); *Houston Chronicle Publishing Co.,* 673 S.W.2d at 324.

The Court has already determined that the public has a legitimate interest in the information sought; consequently, the second prong of the test has not been met, and Texas common law will not prevent disclo-

sure of the information in issue. While a person of ordinary sensibilities might well be embarrassed by a revelation that they engaged in some sort of recruiting prohibited by the Defendants, his or her embarrassment cannot prevent disclosure of information in which the public has a legitimate public interest.

Both Defendants argue that ORD–142 requires that the information sought be protected. TEX. ATT'Y GEN. ORD–142 (1976). The Court is not convinced that ORD–142 mandates the result sought by Defendants. The requestor in ORD–142 sought disclosure of SWC minutes. He asserted that the public had an interest in understanding the rationale behind certain actions of SWC representatives from public universities. The Attorney General noted that the SWC minutes contained no details of allegations or investigations and thus could not explain the reasons for the actions taken. The opinion noted that the individuals reprimanded had a privacy interest in their name and the fact of the reprimand. The Attorney General concluded that the requestor failed to show a public interest in the minutes.

In this case, Plaintiffs and Intervenors have demonstrated a legitimate public interest in the information sought. Moreover, the Attorney general has since determined that an individual's name, the fact that they were disciplined, the punishment assessed and the facts which led to the discipline are not private under section 3(a)(2) of the Act. TEX. ATT'Y GEN. ORD–315 (1982). While this exception is not involved in this case, the privacy standard or analysis involved is the same as that employed for a section 3(a)(1) analysis. *Hubert v. Harte-Hanks Texas Newspapers, Inc.*, 652 S.W.2d 546 (Tex.App.—Austin 1983, writ ref'd n.r.e.). The Court is of the opinion that the second prong of the *Industrial Accident Board* test has not been satisfied; therefore, that aspect of state common law privacy will not bar disclosure of the information in issue.

■ The "false light" privacy concept was recognized in *Industrial Accident*

*Board,* 540 S.W.2d at 682, and applied by the Attorney General in ORD–308. TEX. ATT'Y GEN. ORD–308 (1982). There, the Attorney General held that portions of an investigative report would place an individual under investigation in a false light. Those portions were presumed false because:

> 1) the information [was] communicated to a public body by an anonymous source; 2) the agency made a determination that the information [was] not in fact true; and, 3) the public interest in disclosure was minimal.

*Id.* The Attorney General subsequently held:

> A governmental body may withhold information on the basis of false light privacy only if it finds, based upon the weight of the evidence *demonstrable* to this office, that there are serious doubts about the truth of the information. In addition, the information must be highly offensive to a reasonable person and the public interest in disclosure must be minimal.

TEX. ATT'Y GEN. ORD–372 (1983) (emphasis added). "This is not a balancing test; the information must satisfy *both* of these tests [highly offensive and of minimal public interest] to be held non-disclosable." *Id.* ORD–400 (1983).

The Court has already determined that the public has a legitimate interest in the information at issue. Further, a majority of the information communicated to the defendants did not come from an anonymous source. The information which did come from an anonymous source is not specifically identified by Defendants. Moreover, the Defendants have failed to point out the demonstrable evidence which establishes serious doubt about the truth of any particular piece of information. The Act requires that the governmental body "determine which specific exception applies to particular information. Open Records Decision No. 150 (1977). A general claim that an exception applies to an entire report, when that exception is clearly not applicable to all of the information in the

report, does not comport with the procedural requirements of the Act." *Id.* ORD–419 (1984). Both the Act and this Court's May 15, 1986 Order require that Defendants specify the exemption claimed for each piece of information. Specificity is lacking with regard to this claimed exemption. The Court is of the opinion that the "false light" privacy concept will not bar disclosure of the information at issue.

■ Both Defendants claim that the common law informer's privilege bars disclosure of the information sought.

> The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law enforcement officials and, by preserving their anonymity, encourages them to perform that obligation.

*Rovario v. United States,* 353 U.S. 53, 59, 77 S.Ct. 623, 627, 1 L.Ed.2d 639 (1957). The privilege has been extended to those who provide information to "administrative officials having a duty of inspection or law enforcement within their particular spheres." *E.g.,* TEX. ATT'Y GEN. ORD–285 (1981) (police department investigation); ORD–279 (1981) (zoning ordinance enforcement with criminal penalties); ORD–230 (1979) (school district investigation of alleged employee criminal conduct). The privilege has been extended only to agencies which exercise some police power. Neither Defendant has a duty of inspection nor a duty of law enforcement. In short, they are not authorized to exercise any form of police power. Therefore, the informer's privilege will not bar disclosure of the information at issue.

### 4) *Freedom of Association*

■ The NCAA argues that any disclosure mandated by the Act "would violate the member school's and student's constitutional right of freedom of association." The NCAA cites *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) in support of its argument that disclosure will infringe upon its member school's right to "engage in association for the advancement of beliefs and ideas." *Id.* at 460, 78 S.Ct. at 1170.

The Court previously rejected the NCAA's claim that the association was protected by the first amendment guarantee of freedom of association. *Kneeland, et al v. NCAA, et al.,* 650 F.Supp. 1064, 1069–70 (W.D.Tex.1986). The Court will assume that the NCAA has standing to assert the associational rights of its members. *See NAACP v. Alabama,* 357 U.S. 449, 458–59, 78 S.Ct. 1163, 1169–70, 2 L.Ed.2d 1488 (1958); *Industrial Foundation,* 540 S.W.2d at 678. The first amendment protects the individual's right to speak freely, advocate ideas, associate with others, and petition the government for redress of grievances. *Smith v. Arkansas State Highway Employers, Local 1315, et al.,* 441 U.S. 463, 464, 99 S.Ct. 1826, 1827, 60 L.Ed.2d 360 (1979). The government cannot impede an association's right to advocacy on behalf of its members by general prohibition or by imposition of sanction for expression of a particular view that it opposes. *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969); *NAACP v. Batton,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). Further, the government cannot require disclosure of membership in an association in an attempt to restrain freedom of association. *NAACP v. Alabama,* 357 U.S. 449, 462, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488 (1958); *Plante v. Gonzales,* 575 F.2d 1119, 1132 (5th Cir.1978).

Disclosure of the information in issue will not prohibit the NCAA's members from joining together, "or persuading others to do so, or from advocating any particular ideas." *Smith,* 441 U.S. at 465, 99 S.Ct. at 1828. There are no allegations in this case that disclosure under the Act will result in retaliation or discrimination proscribed by the first amendment. The general public is well aware of the NCAA's role in college sports, the nature of the NCAA's membership, and the fact that prospective student-athletes and student ath-

letes may be improperly recruited. Despite these known facts, the NCAA's membership has not waned. It cannot be seriously argued that disclosure of specific details of recruiting violations will adversely affect NCAA membership. This conclusion is supported by the fact that the NCAA currently maintains almost exclusive control over college sports. Any institution that desires to maintain a significant program in major sports must adhere to NCAA rules. "[M]embership in the NCAA is a prerequisite for institutions wishing to sponsor a major, well-rounded athletic program." *Board of Regents v. NCAA,* 546 F.Supp. 1276, 1288 (D.C.Okla.1982), *aff'd,* 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984); Weistant, *Legal Accountability and the NCAA,* 10 J.C. & UNIV. LAW 167, 171–72 (1983).

The NCAA has failed to demonstrate that disclosure required by the Act is motivated by a retaliatory or discriminatory intent or has any retaliatory or discrimination effect. The member's first amendment right to freedom of association will not be abridged by disclosure of the information in issue.

### 5) *Attorney-Client Privilege*

■ The NCAA asserts that some documents are protected from disclosure by the attorney-client privilege. Confidential communications between attorney and client for the purpose of obtaining legal advice are protected by this privilege. *Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976); *Hodges, Grant & Kaufmann v. United States Government,* 768 F.2d 719, 720–21 (5th Cir.1985). The burden of demonstrating the applicability of the privilege rests upon the NCAA. 768 F.2d at 721. If the NCAA establishes applicability of the privilege, it will have established a compelling demonstration that the information should not be disclosed and met the presumption of section 7(a).

The Court has reviewed the documents that are claimed to be exempt under the attorney-client privilege, and is of the opinion that the information contained therein was communicated between attorney and client for the purpose of obtaining legal advice. NCAA document numbers 863, 865, 874, 875, 876 and 1815A fall under the privilege and shall not be disclosed.

### 6) *Exception for Self-Critical Analysis*

■ The NCAA alleges that the documents submitted for *in camera* review were generated as the result of their member institutions' cooperation and participation in various NCAA investigations. Much of the information sought is the product of the member institutions' internal investigation of allegations posed by the NCAA. Consequently, the NCAA argues that the requested information is protected by a privilege of self-critical analysis. The Court previously ruled that the NCAA could not assert the privilege. *Kneeland, et al v. NCAA, et al.,* 650 F.Supp. 1064, 1075 (W.D.Tex. Aug. 18, 1986). Intervenor A.H. Belo Corp. argues further that the NCAA has no standing to assert the privilege, if any, for its member institutions. The Court will assume the NCAA's standing to assert this privilege, if any, on behalf of its member institutions. *See Industrial Foundation,* 540 S.W.2d at 668.

As noted in the Court's prior opinion, the privilege of self-critical analysis protects against disclosure of information generated by internal investigations. *Kneeland,* at 1075. Three criteria must be met before the privilege is effective:

1. the information must result from a critical self-analysis undertaken by the party seeking information;

2. the public must have a strong interest in preserving the free flow of the type of information sought; and

3. the information must be of the type whose flow would be curtailed if discovery were allowed.

Note, *The Privilege of Self-Critical Analysis,* 96 HARV.L.REV. 1083, 1086 (1983); *e.g., Bredice v. Doctors Hospital, Inc.,* 50 F.R.D. 249, 250–51 (D.D.C.1970), *aff'd,* 479 F.2d 920 (D.C.Cir.1973).

The Court has found no authority in this Circuit which recognizes the privilege of self-critical analysis. Even if the Court assumes the viability of the privilege, the NCAA cannot establish the second criteria set out above. The public may have an interest in preserving the free flow of the information sought, but even more compelling is the public overriding interest in disclosure of the information for the reasons previously outlined. Further, any harm incurred because of disclosure occurred when the member institution disclosed the results of its internal investigation to the NCAA. The purpose of the privilege is to encourage frank internal review. Once the results of an investigation are presented to the NCAA that purpose is vitiated. The privilege of self-critical analysis will not bar disclosure of the information sought by Plaintiffs and Intervenors.

B) *Section 3(a)(8); Law Enforcement Records*

■ Defendant SWC asserts that the information in issue is exempt as law enforcement records. This exception has generally been restricted to records of governmental agencies that investigate and enforce criminal laws. *See e.g., Heard v. Houston Post Co.*, 684 S.W.2d 210, 212–13 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.); *Houston Chronicle Publishing Co.*, 673 S.W.2d at 320–21; TEX. ATT'Y GEN. ORD–438 (1986); ORD–434 (1986); ORD–372 (1983). The SWC is not a law enforcement agency. It is not charged with the investigation or enforcement of criminal laws. The only rules it enforces are promulgated by its members. Even if this Court extended this exception to the SWC, it applies only "if the release of information would 'unduly interfere' with law enforcement or prosecution." TEX. ATT'Y GEN. ORD–438 (1986). "When the "law enforcement' exception is claimed as a basis for excluding information from the public view, the agency claiming it must reasonably explain, if the information does not supply the explanation on its face, how and why release would unduly interfere with law enforcement." ORD–434. Defendant SWC has not demonstrated that

prosecution based upon any piece of information it holds is anticipated. Further, Defendant has submitted no evidence which demonstrates that release of any information would unduly interfere with enforcement of criminal laws. Section 3(a)(8), therefore, is inapplicable. ORD–438 (1986).

C) *Section 3(a)(11); Inter-Agency or Intra-Agency Memoranda*

■ Both Defendants claim that virtually every document produced for *in camera* inspection is an inter-agency or intra-agency memoranda excepted from disclosure by section 3(a)(11). Section 3(a)(11) is designed to protect from disclosure "advice and opinions on policy matters and to encourage open and frank discussion between subordinate and chief concerning administrative action. Attorney General Opinion H–436 (1974); Open Records Decision Nos. 179 (1977); 168 (1977), 163 (1977), 149 (1976), 137 (1976), 128 (1976), 86 (1975), 81 (1975), 29 (1974) and 20 (1974)." TEX. ATT'Y. GEN. ORD–196 (1978); *e.g., Austin v. City of San Antonio*, 630 S.W.2d 391, 394 (Tex.App.—San Antonio 1982, writ ref'd n.r.e.); TEX. ATT'Y GEN. ORD–429 (1985); ORD–392 (1983); ORD–308 (1982). When advice, opinions and recommendations appear in the same document with objective factual dates, the factual information should be severed and disclosed. OP. TEX. ATT'Y GEN. NO. H–436 (1974); *e.g.,* ORD–435 (1986); ORD–429 (1985). If the factual information cannot be reasonably severed from advice, opinion or recommendations, the information will not be disclosed. *See id.* ORD–429 (1985). If the agency adopts or incorporates by reference a memorandum in explaining the basis of a decision, the exception is waived and the information must be made public. TEX. ATT'Y GEN. ORD–137 (1976) (*citing NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975)). In determining what constitutes an opinion, it is important to note the distinction between evaluation and recommendation.

ORD–213 (1978). Only recommendations will be excepted.

The vast majority of the documents submitted for *in camera* inspection contain objective factual information. In fact, most of the documents contain only objective factual information. The NCAA has not attempted to assist the Court in separating advice, opinion and recommendation from objective fact. Rather, it claims that entire documents, a significant number of which consist of hundreds of pages, are excepted by this section. The SWC is generally more specific, and claims that certain paragraphs should be exempted. Because the presumption of section 7(a) is in effect, Defendants must establish a compelling demonstration that the information in issue should not be released.

Defendants have met this burden only to the extent that the Court has applied the privacy exceptions under section 3(a)(1). In all other respects the Court has found no compelling demonstration that the information claimed to be exempted under section 3(a)(11) should be excepted from disclosure. Accordingly, the Court is of the opinion that section 3(a)(11) will not bar disclosure of the information in issue.

D) *Sections 3(a)(14) and 14(e); Student Records*

 Both Defendants allege that "almost *all* " of the information in issue consists of student records and therefore cannot be disclosed under sections 3(a)(14) and 14(e) of the Act. Section 3(a)(14) excepts from disclosure "student records at educational institutions funded wholly, or in part, by state revenue; ..." TEX.REV. CIV.STAT.ANN. art. 6252–17a, § 3(a)(14) (Vernon Supp.1986). Section 14(e) states: "Nothing in this Act shall be construed to require the release of information contained in education records of any educational agency or institution except in conformity with the provisions of the Family Educational Rights and Privacy Act [the Buckley Amendment]...." *Id.*, § 14(e). The Act does not define "educational institution or agency" or "student records." Moreover, the Buckley Amendment clearly states that an education "agency or institution [is] any public or private agency which is the recipient of funds under any applicable program." 20 U.S.C. § 1232g(a)(1)(C), (3) (1982). Further, the Buckley Amendment defines education records as "those records which: 1) are directly related to a student, and 2) are maintained by an educational agency or institution or by a party acting for the agency or institution." *Id.*, § 1232g. "[T]he prohibitions of the Amendment cannot be deemed to extend to information which is derived from a source independent of school records." *Frasca v. Andrews,* 463 F.Supp. 1043, 1050 (S.D.N.Y. 1979). If the Defendants are educational agencies or institutions under either provision of the Act, the information in issue may be disclosed only in accordance with the Buckley Amendment and the Act.

There is no evidence that either Defendant is an educational agency or institution under the Buckley Amendment. Nothing in the record indicates that they receive any federal funds. Moreover, the only Court to address the issue specifically held that an intercollegiate athletic conference was not an educational agency or institution as defined by the Act, and that records held by them were not education records. *Arkansas Gazette Co. v. Southern State College, et al.,* 620 S.W.2d 258, 259 (Ark. 1981), *appeal dismissed and cert. denied,* 455 U.S. 931, 102 S.Ct. 1416, 71 L.Ed.2d 640 (1982). The Defendants do not fit the definition of educational agency or institution under the Buckley Amendment. Moreover, the Court is not convinced that the information in issue is "maintained by [Defendants] acting for the agency or institution," i.e., their member universities. The record reflects that the information maintained by the Defendants is not necessarily provided by their member universities; it is often not available to member universities, and, as this case demonstrates, it is often used *against* the member universities. It can hardly be argued that the information is held *for* the member universities. *Contra* TEX. ATT'Y GEN. ORD–142 (1976) (SWC Records held to be education records). The

Defendants are not education agencies or institutions under the Buckley Amendment.

The Defendants are "educational institutions" under section 3(a)(14) if, among other things, "education is the primary function of the institution." TEX. ATT'Y GEN. ORD–427 (1985) (*citing LaManna v. Electrical Workers Local Union No. 474*, 518 S.W.2d 348 (Tenn.1974)); ORD–142 (1976).

"*One* of the NCAA's avowed purposes is to maintain 'intercollegiate athletics as an integral part of the education program.'" NCAA Brief on Exceptions at 28 (*citing Justice v. National Collegiate Athletic Ass'n*, 577 F.Supp. 356, 361 (D.Ariz.1983)) (emphasis added). Defendant SWC would not dispute application of this premise to it. Defendants are basically non-profit service organizations which facilitate athletic competition between their member institutions. The educational benefits afforded students by the Defendants, if any, are collateral. Despite the NCAA's insistence that "it cannot be seriously controverted that the NCAA is an 'educational institution,'" the court cannot find that its primary function is education.

▇ Even if the Court did find that Defendants were educational institutions, application of sections 3(a)(14) and 14(e) would not bar disclosure of the information in issue. The Court has previously ruled that the names of all students and all other facts be redacted from the information ordered disclosed. In ORD–165, the Attorney General considered whether a school district would disclose student discipline records. The issue was whether the information was "personally identifiable as to particular students so as to bring it within the restrictions of the Buckley Amendment." *Id.* The opinion noted that personally identifiable meant:

(a) the name of a student, the student's parent or other family member, (b) the address of the student, (c) a personal identifier, such as the student's social security number or student number, (d) a list of personal characteristics which would make the student's identity easily traceable, or (e) other information which would make the student's identity easily traceable.

*Id.* Obviously, this information included that which would make the student's identity easily traceable. The Attorney General concluded that a workable compromise between individual privacy rights of students and the public's right to information about government agencies could be achieved by deletion of the personally identifying information. *Id.* (*citing Department of the Air Force v. Rose*, 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976)). The opinion notes that section 14(e) does not require absolute certainty that a student's identity would never be discussed. *Id.*

This Court is of the opinion that the deletion of personally identifiable information as previously Ordered will adequately protect the privacy interests of the students identified in the information sought by Plaintiffs and Intervenors.

IV. CONCLUSION

The Court is of the opinion that deletion of the names of students, student-athletes, prospective student athletes and their family members, as well as all transcripts, phone numbers, bank account numbers, social security numbers, and geographical and biographical information about these individuals is required by section 3(a)(1) of the Act. Such information includes the name and location of a student's high school or its equivalent. Further, the Court finds that the attorney-client privilege excepts from disclosure NCAA document numbers 863, 865, 874, 875, 876 and 1815A. Those SWC documents which pertain to ongoing investigations, as designated by the SWC, shall not be disclosed.

The Court is of the opinion that sections 3(a)(8), 3(a)(11), 3(a)(14) and 14(e) will not bar disclosure of the remaining information in issue.

ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED and DECREED that Plaintiffs' and Intervenors' applications for writ of mandamus are hereby GRANTED IN PART.

IT IS FURTHER ORDERED that Defendants redact from the information sub-

mitted for *in camera* inspection all information described above and make the redacted information requested available to Plaintiffs and Intervenors within sixty (60) days of the date of this Order.

The Clerk of this Court is hereby ORDERED to file all information submitted to this Court for *in camera* inspection as part of the record in these proceedings. The information shall remain under SEAL until further Order of this Court.

The Court would note that some of the documents Ordered released contain personal or sensitive information; consequently, the Court has some concern about their fair and legitimate use. The content of some of the very documents sought by Plaintiffs and Intervenors demonstrate an irresponsible, incomplete, and haphazard approach taken by the media in reporting college athletic events and recruitment. The Court cannot, and will not, attempt to control the media's use of public information. The Court will, however, encourage *studied and responsible* use of such information. The rights and privileges guaranteed by the Constitution and laws of this country must be exercised responsibly if those rights are to endure.